**SECURITIES AND EXCHANGE COMMISSION**

v.

**ABERDEEN SECURITIES CO., INC., et al.**

Appeal of Sherwin SELIGSOHN et al.

No. 72–1708.

United States Court of Appeals, Third Circuit.

Argued April 30, 1973.

Decided June 28, 1973.

Theodore H. Focht, Gen. Counsel, Washington, D. C., SIPC, for appellees. Wilfred R. Caron, Asst. Gen. Counsel, Washington, D. C., for SIPC, of counsel.

John Biggs, III, Wilmington, Del., for Claude P. Hudston, Trustee.

Jerry E. Bogutz, Warren L. Soffian, David S. Rasner, Philadelphia, Pa., for appellants.

Before HUNTER and WEIS, Circuit Judges, and NEWCOMER, District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

We are confronted in this case by the intricacies of the Securities Investor Protection Act of 1970 [1] which seeks to provide assistance to those investors unfortunate enough to have selected a stockbroker, who perhaps is able to give sound financial advice to others but is unable to stay solvent himself. The intent of Congress to protect customers of financially distressed security dealers is clear, but the specifics of precise resolution of individual situations are clouded by the provisions of a statute which range far from the clarity of blue sky one might expect in this area of the law.

While the Securities and Exchange Commission has been given authority to enact appropriate regulations, it has not done so, and we therefore are left with the task of filling in rather large interstices in the Act resulting in part from engraftment of insurance provisions upon the preexisting Section 60(e) bankruptcy provisions applicable to stockbrokers, 11 U.S.C. § 96(e).

The Securities Investor Protection Act was passed by Congress in 1970 in response to demands that it provide some assurance to investors that they would not suffer financial loss as a consequence of bankruptcy of their stockbrokers. While the theory of the statute was that it was to provide a type of protection for security purchasers somewhat similar to that enjoyed by bank depositors under the FDIC, the complexities of the securities market obviously required some major differentiations.

In broad outline the legislation contemplates the appointment of a Receiver in the event of the insolvency of a broker who is covered by the terms of the statute. A liquidation, rather than a reorganization, is to be conducted and the claims of the debtor's customers are to be paid promptly. To the extent that the insolvent broker's assets are insufficient to satisfy obligations to his clientele, the Securities Investor Protection Corporation (SIPC), an entity established by the Act, will advance funds to pay claims up to $50,000 per customer, of which no more than $20,000 represents reimbursement of cash.

The account of a customer is to be valued as of the day when proceedings

1. 15 U.S.C.A. § 78aaa et seq.

are instituted against the broker—the "filing date"— in order to determine his "net equity". A computation is made to arrive at the dollar amount of the customer's account by excluding from it, specifically identifiable property which is returned to him; by deducting indebtedness and other obligations, if any, to the insolvent broker; and by giving effect to certain open contractual commitments.

All property held by the debtor for the account of his patrons, other than that specifically identifiable, forms a single and separate fund in which all customers are entitled to share pro rata.

The Trustee may satisfy customer claims from the single and separate fund or from the monies advanced by SIPC or by a combination from the two sources. To the extent that a claim is satisfied by advances from SIPC, it is subrogated to the customer's rights to a pro rata share of the single and separate fund.

We must deal with two distinct types of claims in this case which require more detailed analysis of specific portions of the Act and in the interest of clarity, we will treat each claim separately.

## THE SELIGSOHN CLAIM

One Sherman Seligsohn placed an order with his broker, Aberdeen Securities Company, Inc., on July 28, 1971 for 400 units [2] of Oratronics Corporation and remitted the full price of $2,000. He received a notice from Aberdeen advising that "as agent for the underwriter we have sold to you" 400 Oratronics and acknowledging receipt of payment. Seligsohn never received the certificates from Aberdeen or any indication that they were being held for his account by the broker.

On September 15, 1971 an application was made to the United States District Court for the District of Delaware for the issuance of a temporary restraining order against Aberdeen to enjoin violations of the Securities Act. Later a Trustee was appointed under the provisions of the Securities Investor Protection Act.

The Trustee found that Aberdeen had in its possession only 100 units of Oratronics and that three other customers had claims for 900 units in addition to Seligsohn's 400. In due course the Trustee submitted to the Court a proposal to pay Seligsohn $1,245.38 in cash plus 31 units of Oratronics which was his pro rata share of the securities which had been found in the debtor's office.

Seligsohn protested this method of satisfying his claim and since the securities had risen in value, understandably demanded that the Trustee provide him with 400 units instead.[3] Additionally, Seligsohn asked permission to appear in a class action as a representative of those similarly situated.

After hearing, the District Court approved the Trustee's proposed disposition of Seligsohn's claim and rejected the motion to treat the proceeding as a class action.

Section 6(g) of the Act [4] requires the Trustee to discharge promptly:

". . . all obligations of the debtor to each of its customers relating to, or net equities based upon, securities

---

2. These "units" were a combination of stock shares and warrants.

3. The practical problem presented in this claim involves time. As we read the act, a customer's position is frozen as of the date a brokerage house goes into liquidation. From that date until his claims are paid, a customer is at the mercy of the market. If the market rises, he "loses"; if it falls, he "wins". To read the act as appellant contends would help the customer in a rising market, but it would leave open the problem of a falling market. The change of values between filing date and the time when the claim is paid is a problem for legislative, not judicial, solution. It should be remembered that before SIPC, customers of troubled brokerage houses might not have realized anything at all on their claims.

4. 15 U.S.C. § 78fff(g).

or cash by the delivery of securities or the effecting of payments to such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee . . . For that purpose the court among other things shall—

(1) In respect of claims relating to securities or cash, authorize the trustee to make payment out of moneys made available to the trustee by SIPC . . .

(2) in respect of claims relating to, or net equities based upon, securities of a class and series of an issuer . . . authorize the trustee to deliver securities of such class and series if and to the extent available to satisfy such claims in whole or in part, with partial deliveries to be made pro rata to the greatest extent considered practicable by the trustee."

Section 6(c)(2)(A)(iv) [5] defines the "net equity" of a customer's account as:

"the dollar amount thereof determined by giving effect to open contractual commitments completed as provided in subsection (d) of this section, by excluding any specifically identifiable property reclaimable by the customer, and by subtracting the indebtedness, if any, of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated, by sale or purchase on the filing date, all other securities and contractual commitments of the customer . . ."

■ The Trustee claimed that his action complied with these provisions of the Act. However, the claimant asserts that the duty of Aberdeen to deliver the certificates is an "open contractual commitment" as contemplated by subsection (d), which should be completed by the Trustee through the purchase of Ora-

tronics units in the open market and delivery to Seligsohn.

Section 6(d) [6] reads in part:

"Completion of open contractual commitments. The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date—

(1) in which a customer had an interest, . . . For purposes of this subsection . . . (i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction . . ."

The District Court ruled that undertakings involving only the debtor and his customers are not the contractual commitments contemplated by subsection (d), and therefore the Trustee could not be forced to satisfy this claim in kind. We agree with the conclusion of the learned Court below.

Our review of the legislative history of the Act [7] and the testimony by various witnesses before committees of both the Senate and the House convinces us that the open contractual commitments covered by § 6(d) are those between the debtor and another broker-dealer.

The securities industry was concerned with the "domino effect" of the financial difficulties of one broker extending to others with whom he dealt and wished to isolate problems to the one who was insolvent if at all possible. However, there was considerable sentiment in Congress to limit the protection of the Act to customers and not to ex-

5. 15 U.S.C. § 78fff(c)(2)(A)(iv).

6. 15 U.S.C. § 78fff(d).

7. 1970 U.S.Code Congressional and Administrative News, p. 5254.

tend it to transactions between brokers. The compromise ultimately agreed upon was to provide for completion of inter-broker or interdealer transactions only when the interest of a customer on either side was involved. However, discretion was granted to the SEC to promulgate rules which would allow completion of transactions in which customers did not have an interest if this was determined to be in the public interest.[8]

Only by limiting § 6(d) to open inter-dealer contractual agreements is it possible to arrive at a harmonious relationship with other portions of the Act, such as the definition of "net equity," § 6(c)(2)(A)(iv), and a special provision for advancement of funds by the SIPC in addition to customers' claims provided by § 6(f)(2).[9]

■■ If the order by a customer for the purchase or sale of a specific security has been placed by the debtor with another broker and remains uncompleted on the filing date, then the Trustee is required to complete the transaction. Similarly, if an order has been placed with the debtor by another broker on behalf of his customer, then performance would be required. Even in these situations the securities may not be specifically identifiable property, but of course the transactions would be "given effect" in computing the dollar value of the "net equity" of the customer.

■ We conclude, therefore, that the District Court was correct in refusing to order the Trustee to purchase the Oratronics units in the open market and that it did not err in approving the settlement proposed by the Trustee.[10]

### THE RAIZES CLAIM

In February, 1970, petitioner Raizes placed an order with Aberdeen to purchase 100 shares of Boatland, Inc., a prospective new issue. This purchase was confirmed by Aberdeen as principal

---

8. Hearings before the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce, House of Representatives on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, H.R. 18458, Ninety-first Congress, Second Session 1970.
Page 226, Mr. Budge [Chairman of the SEC]: "Yes, sir; the industry's proposal, if I recall it correctly, would permit the SEC to make the determination in this area. This language restricts the obligations to transactions on behalf of customers as distinguished from transactions between broker-dealers for the accounts of broker-dealers.
"Mr. Focht: Open transactions between broker-dealers for those accounts?
"Mr. Budge: Yes, sir.
\* \* \* \* \*
"Mr. Loomis [General Counsel for the SEC]" The thought here is where there is an open, uncompleted transaction for the account of public customers, whether it results in a profit or a loss to the debtor, it should be closed and completed in order to avoid uncertainties and the creation of various problems within the industry—people owing money and having money coming to them, owing securities, having securities coming to them . . .
\* \* \* \* \*

Page 329:
"Mr. Budge: There also is a recognition of the fact that many interdealer transactions and bank transactions may be for the account of customers. Where this is so, the coverage also applies. The bill would require completion of securities transactions of the debtor broker-dealer made in the ordinary course of its business and outstanding on the date the Corporation petitions the court for the appointment of a trustee, if such transaction involves a customer of the debtor of another broker or dealer who entered into such transaction on behalf of a customer. Open transactions between the debtor and other brokers or dealers where neither was acting on behalf of a customer could not be completed by the trustee unless the Commission, by rule or regulation, determined that the completion of such commitments are in the public interest."

9. 15 U.S.C. § 78fff(f)(2).

10. A similar interpretation of § 6(d) contractual commitments was reached by the district court for the District of Massachusetts in an unreported memorandum, Securities and Exchange Commission v. Security Planners Ltd., et al., Civil Action No. 71–656–M, June 23, 1972.

within a few days and was paid for by the Raizes in the form of a credit of $500 from their account. No certificates were ever received from Aberdeen although funds were transmitted by it to Charter Securities, Inc., a broker-dealer in New York City, which was underwriting the Boatland offering. The transaction was not completed because the stock was never issued, and Boatland and Charter Securities both went into bankruptcy. The Raizes filed a claim against Charter as a general unsecured creditor in that bankruptcy proceeding. All of these events occurred before the filing date of September 15, 1971.

In the Court below, the Trustee determined that the net equity as to the Boatland transaction on the date of filing was zero and therefore proposed to make no payment to the Raizes. The District Court reluctantly agreed with this action, stating that it was unfortunate that the Raizes would receive no compensation for their loss but that the wording of the statute mandated that result.

We feel that the Court below did not correctly consider the definition of net equity in the context of this fact situation and remand for further proceedings.

■ We need not consider whether the transaction might fall in the category of a subsection (d) uncompleted commitment because the facts demonstrate that since this particular stock was not in existence, the purchase never could be made. The Raizes, therefore, do not have a claim for the stock itself.

At the hearing, the Court properly posited the possibility of the existence of a claim by these customers against Aberdeen but was diverted by argument on the applicability of open contractual commitment or single and separate fund theories rather than being aided by an analysis of the term "net equity."

The record is silent on the point but, for purpose of discussion, we assume that the Raizes' total claim was less than $50,000 and that the cash portion thereof less than the $20,000 coverage provided by the Act. In such a situation the single and separate fund concept is of academic, if any at all, interest to the customers. Their prime concern must be to insist upon payment of the "net equity" valuation with funds advanced by the SIPC as necessary.

■ The definition of "net equity" was taken in part from § 60(e) of the Bankruptcy Act[11] but was modified somewhat in the drafting of the Securities Investor Protection Act of 1970. Unfortunately, some clarity was lost in the process. Thus the particular section does not make it crystal clear that the customer's net equity consists of both his cash balance and the securities account valued as of the filing date. We have no doubt, however, that the "dollar amount" of a customer's account includes his cash which the broker has, or should have, been holding. Indeed, the SIPC says in its brief:

"In short, the 1970 Act contemplates (as did § 60(e)) that a customer's cash and securities position will be *netted out* as of the filing date . . . ."

Furthermore, subsection (g) recites the duty of the Trustee:

"To discharge promptly . . . all *obligations* of the debtor to each of its customers relating to, or net equities based upon securities or cash . . . ."

■ Thus, if under local law, or by virtue of regulations under which it operated, the debtor was obligated to refund the $500 to the Raizes because of inability to deliver the Boatland stock, then there would be a claim for cash properly included in the term "net equity."

Since the record does not contain sufficient facts upon which we can rule, we remand to the District Court for appropriate findings in order to determine if

11. 11 U.S.C. § 96(e).

there was, on the filing date, a legally sufficient claim by the Raizes against the debtor because of an obligation to return the money which had been made available to Aberdeen for purchase of a nonexistent stock.

### THE CLASS ACTION ISSUE

 Both Seligsohn and Raizes petitioned the Court to treat their claims as part of a class action. The District Court declined to so order contending that the procedures in the bankruptcy proceeding were adequate to protect the interest of all prospective members of the class. We find no error in the District Court ruling.

While there may be some question whether the order of the lower Court in this respect is appealable, we prefer to deal with it on the merits at this time. *See* 2 Collier on Bankruptcy, 14th Ed., pp. 792, 794, 789.

This Court has already decided that Fed.R.Civ.P. 23, the class action provision, is not an appropriate vehicle in a railroad reorganization. *See* In Re: Penn Central Transportation Company, 328 F.Supp. 1273 (E.D.Pa.1971), aff'd 455 F.2d 976 (3rd Cir. 1972). Much the same considerations which apply to the reorganization of a railroad apply also in this proceeding which is to be conducted under those provisions of Chapter X of the Bankruptcy Act not inconsistent with the Investor Protection statute. See §§ 78eee(b)(2) and 78fff(b)(1).

All creditors were given notice of the insolvency proceedings, and they were given the opportunity to file claims. A ruling by the Court as to one category of creditors certainly would apply to all in that group. Furthermore, this is not a plenary suit but a liquidation proceeding which should be concluded as expeditiously as possible. We see no indication that a class action designation would have such a result. The petitioners failed to show that the method they advocated was superior to the procedures being followed by the Bankruptcy Court. The determination made by the District Court on this point is amply supported by the record and well within its discretion.

The orders as to the Seligsohn claim and the denial of applications to proceed as class actions will be affirmed. The order as to the Raizes' claim will be reversed and remanded for further proceedings not inconsistent with this opinion.