**In the Matter of WEIS SECURITIES, INC., Debtor.**

**In re TRUSTEE'S SETTLEMENT OF OPTION WRITING ACCOUNTS and Cash In Lieu of Securities.**

**No. 73 Civ. 2332.**

United States District Court, S. D. New York.

March 2, 1976.

Hughes Hubbard & Reed, New York City, for trustee; John M. Townsend, New York City, of counsel.

Holtzmann, Wise & Shepard, New York City, for claimant Jules B. Lipow; James W. Deer, New York City, of counsel.

Frank & Frank, New York City, for claimant Maury Ray; Irving Frank, New York City, of counsel.

Bell, Wolkowitz, Beckman & Klee, New York City, for claimant Stanley Sharp; Richard Klee, New York City, of counsel.

Dan Moody, Jr., pro se.

John H. Daum, pro se.

WYATT, District Judge.

These are an appeal and five cross-appeals from an order of Bankruptcy Judge Babitt filed October 6, 1975.

Weis Securities, Inc. (Weis) was a broker-dealer which is now in liquidation under SIPA (15 U.S.C. § 78aaa and following). A Trustee was appointed on May 30, 1973, by this Court (15 U.S.C. § 78eee(b)(3)). See *Exchange Bank v. Wyatt,* 517 F.2d 453 (2d Cir. 1975). The "filing date" (15 U.S.C. § 78eee(b)(4)(B)) was May 24, 1973.

The appeal is by the Trustee; the cross-appeals are by option customers of Weis. The so-called "record on appeal" (Bankruptcy Rule 806) is made up of letters, affidavits, memoranda of law, and other papers. There seems to have been no hearing and no taking of evidence.

What is involved are charges made by the Trustee against certain option customers of Weis, that is, customers who caused Weis to sell option contracts. They are often called by the parties and by the Bankruptcy Judge option "writers" or option writer customers but in fact they wrote nothing and signed no options. They are called herein option customers.

The appeals and cross-appeals were heard in open Court on January 16, 1976. Thereafter counsel for the Trustee were asked to supply certain information and

documents. On telephone notice to those who had appeared on January 16, these were supplied in open Court on February 18, 1976. There thus may be some information and documents before me which were not before the Bankruptcy Judge. The stenographic transcript shows the information supplied and the documents have been placed in the file.

1.

There is much trading activity in stock option contracts, sometimes called "puts" and "calls". The techniques employed in option trading are described in *H. Kook & Co. v. Scheinman, etc.,* 414 F.2d 93 (2d Cir. 1969).

At the relevant times and with respect to the option contracts here involved, these were sold for its customers by Weis through members of the "Put and Call Brokers and Dealers Association, Inc." (the Association).

An option contract requires one party (the "endorser") to buy from or to sell to the other party (the optionee, or the holder of the option) a specified number of shares (100 shares, nearly always) at a fixed price during a fixed period. If the option holder can require the endorser to sell shares, he holds a "call"; if the option holder can require the endorser to buy shares, he holds a "put". The option holder pays a premium (a money amount) for the option and this premium went to the Weis option customers.

The options sold by Weis for its customers were all on a one page printed contract form (in appearance like a promissory note) prepared by the Association and used by its members. Options sold by members of the Association must be "endorsed" by a member of the New York Stock Exchange but the word "endorsed" is misused because by the contract the "endorser" is primarily and solely liable to the option holder.

The option contract form states that "the bearer may call on the endorser" for a specified number of shares (100 shares seems to be the standard unit) at a specified price per share within a speci-

fied period from the date of the option contract. (The form for a "put" is similar; "the bearer may put to the endorser", etc.). The option contract states that the "stock option contract" must be presented to the "endorsing firm" before the expiry of the "exact time limit"; that "upon presentation to the endorser of this option . . . the endorser agrees to accept notice of the Bearer's exercise . . . and this acknowledgment shall constitute a contract and shall be controlling with respect to delivery of the stock and settlement in accordance with New York Stock Exchange usage." On the face of the option contract appears the signature of the member of the Association through whom the option was sold by the member of the New York Stock Exchange; the signing member of the Association, however, "acts as intermediary only . . .". On the back of the option contract appear the words "Endorsed By" and a space for the signature of a member of the New York Stock Exchange.

It doubtless was understood by all concerned that the endorser was acting at the instance of one of its customers in selling the option contract. Nevertheless, it seems clear from the option contract itself that it is between the "endorser" and the option holder; the claim of the option holder is solely against the endorser. There is no reference in the option contract to the customer and the name of the customer nowhere appears in that contract. So far as the contract goes, the option holder has no claim against the customer of the endorser.

The option contract runs to "bearer" and thus can be transferred by delivery; it is the equivalent of a bearer security and indeed may properly be described as a bearer security.

To call a customer for whom Weis sold options, an "option writing customer", is to use a highly inexact term because (as already seen) he has not written anything and his name does not appear in the option contracts.

The Weis customers here involved had each caused Weis, before May 24, 1973, to sell for their account option contracts. Weis had signed such contracts as "endorser".

As between Weis and the option holders, Weis was solely and primarily liable.

As between Weis and its own customers, for whom it had sold the options, Weis looked to its customers to indemnify it in respect of the options. It seems that most if not all such customers had cash or securities in their accounts as a protection to Weis on its liability as endorser.

The record is, not entirely clear as to what the financial arrangement was between Weis and its option customers. Apparently any Weis customer with a margin account could sell options through that account, but a form of special agreement ("Puts and Calls Customer's Agreement", a copy of which was supplied by counsel to the Trustee) was required by Weis to be signed. This agreement provided, among other things, that Weis would not be "liable in connection with the . . . endorsing of puts and/or calls for my account, except for gross negligence . . .". and that the customer would reimburse Weis for all expense incurred by Weis in connection with the option contracts. This agreement seems to be a promise by the customer to pay to Weis any sum which Weis is required to lay out on account of the option. It seems to be, therefore, an indemnity agreement from the customer to Weis.

## 2.

The Trustee sent a notice by mail to all customers of Weis, including the option customers, that Weis was being liquidated under SIPA and that claims of Weis customers would have to be filed with the Trustee (claim forms were sent). This notice is dated May 31, 1973, and seems to have been approved by the Bankruptcy Judge by an order made on June 1, 1973. The mailing was either on that date or at some time "before June 3 [1973]" (Trustee Brief, p. 18).

## 3.

On June 1, 1973, the Trustee gave notice (by means of the Dow Jones "broad tape") to the holders of options endorsed by Weis. This notice stated that the procedure for dealing with outstanding options endorsed by Weis could be learned from any member of the Association. The Trustee advised such members of the procedure. This manner of notice was required because (as already seen) the *holders* of option contracts were not known to Weis; the option contracts ran to "bearer".

## 4.

Some procedure had to be worked out by the Trustee for dealing with outstanding options "endorsed" by Weis. If Weis had continued in business or if the Trustee had continued its business, the options could be exercised by their holders in the normal fashion—delivery by the holder to Weis of the shares against payment (on a "put") or delivery to the holder by Weis of the shares against payment (on a "call").

But the Trustee was liquidating Weis; the business of Weis had ceased.

The procedure followed by the Trustee was that when the option holders decided to exercise their options, at that time they presented the option to the Trustee, who would note on the option the time and date of presentation. The option holder could then file a claim against Weis for the difference between the option price and the market price on the day of presentation. The amount of such claim was charged against the account of the Weis option customer.

This procedure did not give to the option holder any right he did not already have; he had the right to exercise his option at any time during the option period. What the procedure accomplished was to fix the money amount of the option holder's claim because, by reason of the liquidation of Weis, it was not in the interest of the Weis estate in liquidation nor was it feasible for the Trustee partly to carry on the business of Weis by permitting the exercise of options in

the normal fashion by delivery of securities to Weis against payment or by payment to Weis against delivery of securities.

### 5.

On July 12, 1973, on application of the Trustee, the Bankruptcy Judge made an order authorizing the mailing to "each recipient of the option contracts" of Weis a copy of a claim form for the money difference between the option price and the market price on the date when the option was exercised (that is, when the notation was made of the presentation of the option contract under the procedure of the Trustee). The application for this order is poor in composition but it may be concluded that in substance it advised the Bankruptcy Judge of the procedure being followed by the Trustee in respect of the outstanding options endorsed by Weis and the order of the Bankruptcy Judge seems to be an approval of this procedure.

### 6.

The Trustee gave attention also to the position of the option customers who would be better off if their accounts with Weis could be transferred to another broker so that the then unexercised options could be treated in normal fashion. The Trustee accordingly worked with Amfod, an acronym for "Association of Member Firms Option Departments", to develop a plan for handling the accounts of the option customers of Weis. Amfod describes itself as "a division of the Securities Industry Association" (a trade association of the securities business) and as "composed of approximately 85 securities firms having option departments that are members of the New York Stock Exchange".

There is no merit in the argument that the Trustee should not have worked with Amfod because the option holders were customers of Amfod members and Amfod would try to secure some special protection for them. The Trustee had to work with Amfod because its members were the brokers whose cooperation was necessary in taking over the Weis option contracts if this advantage were to be secured for the Weis option customers. Moreover, the Trustee is directed by SIPA to honor "open contractual commitments" in order to avoid a "domino" effect from such a failure as that of Weis. *SEC v. Aberdeen, etc.,* cited hereafter.

A plan was worked out by July 20, 1973, and on that date, an application of Amfod (to which the Trustee consented) was submitted to the Bankruptcy Judge for approval.

The plan gave to the Weis option customers the opportunity, at their election, to transfer their option account to another broker chosen by the customer and willing to accept the account on the conditions required by the Trustee. The principal condition was that the new broker would assume the obligations of Weis as endorser on those options of the Weis option customers which had not been exercised at the time of transfer to the new broker. As for those options sold by Weis customers which had been exercised by the holders before transfer, the Trustee required that the new broker pay the claim of the holder measured by the formula announced in the "broad tape" notice. If these conditions were met and the Weis customer requested and authorized the transfer, the Trustee would transfer to the new broker all cash and securities in the option account to which the Weis customer was entitled.

On July 24, 1973, the Bankruptcy Judge filed an order granting the application of Amfod and directing that a notice and letter, in form as approved in the order, be sent to the option customers of Weis.

Again the application is far from explicit but it does advise the Bankruptcy Judge in substance of the procedure which the Trustee had followed on the exercise of options after May 24, 1973. Having been so advised, the order then approved the further procedure for transfer of accounts with indemnity liability for unexercised options.

### 7.

On July 27, 1973, the notice and letter (with statement of each option account), as approved by the Bankruptcy Judge, were mailed out to option customers of Weis.

The notice and letter explained the plan for transfer and also how the Trustee was treating the exercise by holders of options after May 24, 1973. The explanation of this last matter—the relevant matter for present purposes—was far from a model of clarity; it failed to repeat the "broad tape" notice and the outline then made available of the procedure set up by the Trustee to deal with option exercises. But option customers were put on notice that a money claim was being asserted against them by the Trustee because of the option exercises after May 24, 1973, by the holders of options which they had sold through Weis.

### 8.

There were about 32,000 customer accounts of Weis and of these about 450 were customers who had sold about 6,500 options on about 650,000 shares.

After the 450 option customers received the July 27, 1973 notice and letter (with statement of their accounts) nearly all of them accepted the Trustee's treatment of the exercise after May 24, 1973, by option holders of options endorsed by Weis.

Some of the option customers pressed objections before the Bankruptcy Judge. According to his order, there were 28 such objectants; one objecting customer had two separate accounts.

The Trustee submitted two briefs, one dated April 17, 1974, and the other dated April 22, 1974. Various option customers submitted various opposing papers which are included in the massive and helter skelter record on appeal.

There was no evidence taken and no oral argument.

### 9.

The Bankruptcy Judge filed an opinion on July 29, 1975, and an order on that opinion was filed on October 6, 1975. It is from that order that these appeals and cross-appeals are taken.

### A.
### 10.

The Trustee's appeal is from that part of the order of October 6, 1975, which increased by specified amounts the "net equities" of 19 of the 28 objecting option customers.

The Bankruptcy Judge held that the Trustee failed to give option customers "timely notice" and that such failure deprived them of "due process of law"; that "open contractual commitments" (the option contracts) were completed by the Trustee "in a manner adverse to the interests of the debtor's customers" (the option customers); that failure to notify the option customers until July 27, 1973, that their option contracts had been exercised denied an opportunity to the option customers "to purchase any securities necessary for their protection"; and that the option customers "were denied all opportunity to minimize their losses". For these reasons the Trustee was ordered to increase their net equities.

### 11.

The Bankruptcy Judge seems to have misunderstood the situation, probably because some of the relevant documents (such as the form of the option contracts "endorsed" by Weis) were not before him.

He referred to the claimants as "writers of securities options" and as "option writers . . . who speculate . . . by writing contracts . . .". He stated: "The option writer's obligation to perform must be endorsed by his broker . . .". There was nothing written by the Weis customers; they were not parties to the option contracts; they had no obligation under the contracts; the sole obligation to the option holders was that of Weis.

The Bankruptcy Judge stated that the notice on the "broad tape" on June 1, 1973, "permitted the option holders to

purchase any securities necessary for their protection . . .". This seems entirely mistaken. The option holder had no risk against which he needed "protection"; he would only exercise his option if it were an advantage to do so. To "put" stock at a price higher than the then market would normally require the stock, but this could easily be secured temporarily for any advantageous "put". To "call" stock at a price lower than the then market would under no circumstances require stock but only the call purchase price. Under the procedure of the Trustee, the option holders needed no "securities . . . for their protection". They needed only to present their option contracts.

### 12.

The Bankruptcy Judge ruled that failure by the Trustee until July 27, 1973, to notify the Weis option customers "of how and when the options had been exercised" deprived option customers of the opportunity to purchase securities necessary for their protection and denied them due process of law.

The delay for which the Trustee is faulted was from Friday, June 1, 1973, to Friday, July 27, 1973—exactly eight weeks. The fact of which the option customers should have been notified was, it is said at one point, "how and when the options had been exercised". Since some options were exercised at different times during the eight week period, the maximum delay could have been eight weeks but in many if not all cases there must have been a much shorter delay.

The delay in advising option customers of the exercise of the options which they had caused Weis to sell was not due to any intent to withhold the information from them nor was it due to negligence of the Trustee.

It is explained by the Trustee that there were at least 32,000 customer accounts of Weis, of which at May 24, 1973, 450 contained sales of outstanding options; that the accounts containing option sales were not segregated or specially identified; and that option sales were made through a customer's ordinary margin account. Moreover, the option contracts themselves (copies of which Weis presumably had) do not indicate the customer for whom the option was sold. It was necessary for the Trustee first to identify the 450 accounts containing options out of the 32,000 accounts in total; on the exercise of each option (by presentation for stamping), it was necessary to match the option with the account for which it had been sold. This took some time.

It is also apparent that the Trustee understandably wanted (a) to work out a procedure under which option customers of Weis could transfer their accounts to another broker and (b) to notify option customers of such procedure. This would be in the interest of option customers because it would enable them to resume option selling in the normal manner without waiting for the expiration of all option contracts which they had caused Weis to sell. This would also be in the interest of the Weis estate because it would end the necessity for the Trustee to note the exercise of open options, to receive money claims from the option holders, and to charge the accounts of the involved Weis option customers. To work out this procedure required some time. The Trustee did it successfully and so far as appears did it within a reasonable time.

The Bankruptcy Judge approved by order the procedure followed by the Trustee and the notices he sent out. It seems strange for the Bankruptcy Judge thereafter to find that the Trustee had failed to give timely notice. The Bankruptcy Judge indicates in his opinion that he "felt constrained to admit the error of prior action". In my view, his prior action was not error; it was error to find the notice as given a denial of due process of law.

Weis was primarily liable on the options it had sold. The Trustee was obliged to recognize the exercise of those options and to recognize an appropriate money claim upon such exercise. Neither Weis nor the Trustee had any obli-

gation to notify within any particular time the option customers of the exercise of an option they had caused to be sold. This is because there was no agreement between Weis and its option customers providing for such notice.

When the Trustee asserted a claim against a customer based on the exercise of an option, notice was required of the basis for such claim so that the customer might have an opportunity to contest the claim. Such a notice was given on July 27, 1973; some few of the customers did contest the claims; and they have been duly heard. Whatever be the requirements of due process, they have amply been met here.

Thus far the discussion has been of the so-called delay by the Trustee in notifying option customers when their options were exercised.

At other points in his opinion, the Bankruptcy Judge based his ruling on delay in notifying option customers of the *procedure* which the Trustee proposed to follow in recognizing the exercise of options, the "broad tape" notice of June 1, 1973. The Bankruptcy Judge speaks of a failure "to provide them with notice similar to that which he provided the option holders"; he speaks also of a failure of the Trustee to notify option customers of the Trustee's "intended treatment of option contracts"; and he required that option customers be treated "as though notice had been given by June 3, 1973" (a date undoubtedly before any of the options had been exercised) (June 3, 1973 was a Sunday).

The Bankruptcy Judge seems to be mistaken in this respect.

The "broad tape" notice was given on Friday, June 1, 1973. While its first words are "holders of options endorsed by Weis Securities"—which suggests that it was initially directed to such persons—the notice was just as available to option customers as to option holders. It was on a widely used news ticker, the contents of which are matters of public knowledge.

When the "broad tape" notice went out on June 1, 1973, it was public knowl-

edge that Weis was in liquidation. Option customers must have known this and the notice to them by mail, dated May 31, 1973, emphasized that Weis was in liquidation. The option customers thus knew that there might be a problem with the then open options which they had caused Weis to sell. It does not seem too much to require that option customers themselves find out (if they needed to know) how the Trustee intended to deal with the open options.

Moreover, on June 1, 1973, and for some time thereafter, the Trustee could only give notice to option customers by repeating the "broad tape" notice (with a first line specifying "option customers"), or by publication in a newspaper or by mail to 32,000 customers (in order to reach 450). The reason for this has already been noted. Under the circumstances, the methods followed by the Trustee do not seem in the least unreasonable.

### 13.

■ The Bankruptcy Judge apparently felt that the failure (as he saw it) of the Trustee "to provide timely notice" to the option customers gave some unfair advantage to the option holders and was a prejudice to the option customers. He says that the Trustee "completed" the option contracts "in a manner adverse to the interests of" the Weis option customers.

No unfair advantage was given to the option holders. According to the terms of the option contract, the bearer could exercise the option at any time during the option period. This was the primary obligation of Weis. Nothing the Trustee did increased the obligation already assumed by Weis. The Bankruptcy Judge says that the Trustee "permitted the option holders to purchase any securities necessary for their protection". As already shown, this is mistaken because the holder of the option needed no protection and needed no securities; he had no risk.

The suggestion is that there was a prejudice to the option customers be-

cause, not knowing of the exercise of the options they had caused to be sold, they were "denied all opportunity to minimize their losses". This suggestion seems to have no basis in fact.

Nothing prevented the option customers from buying or selling any shares they desired through any broker able and willing to execute their orders. There is no showing how it would be possible to "minimize their losses" but, in any event , the Trustee did not prevent the option customers from doing so.

Cross-appellant Moody suggests that he was prejudiced because the Trustee arranged with the option holder to substitute a money claim against the Trustee for specific performance of the option by the Trustee. This meant, according to Moody (Brief, p. 15) that he could not protect himself: if the option holder had put the shares themselves to Weis (most of the Moody options were puts) and Weis had turned over the shares to Moody, he "could have held the stock . . . until there was a more favorable market . . .". (Brief, p. 15) This would require, however, that the Trustee continue a part of the Weis business (dealing with options) for the term of the unexercised options. This would require personnel, premises, and other administrative costs. The Trustee was liquidating the business, not operating it. Moreover, if the Trustee were to pay out money to accept "put" shares, this would raise serious questions whether this was a proper liquidation and whether cash in the hands of the Trustee could be so expended; similar questions would be raised were the Trustee to turn over the put shares to the Weis customer who had sold the option. There might well be claims of others to a return of shares of the same company; the Trustee could not ignore such claims if there were not enough shares of that company to satisfy all claims.

But if it be assumed that there were some beneficial market operations which might have been carried out had the option customers known promptly when their options were "exercised" (that is,

reduced to a money claim), loss of such benefit under the circumstances here was simply one of the unfortunate results of the Weis failure. It does not seem a justification for increasing the "net equity" of the option customers.

The contrary view of the Bankruptcy Judge was probably due to his mistaken assumption that the option holder had a contract with the customer and therefore could have exercised the option by requiring the customer directly to perform. As has been seen, the Weis customer had no obligation to the option holder. The option holder had to put the shares to Weis or call on Weis for the shares. Since the Trustee was not carrying on the business of Weis, the procedure he followed (which was approved by the Bankruptcy Judge) was a reasonable method for recognizing the money claim of the option holder. Because the Trustee did not carry on a part of the Weis business for their benefit should not entitle option customers to special treatment. Their agreement with Weis made them liable for any "expenses" of Weis in connection with the options. That agreement, however unclear on other points, is entirely plain in this respect:

> "I [ the option customer] further agree that any and all expenses incurred by you [Weis] in this connection will be reimbursed by me".

It seems reasonable and proper that the money claims of the option holders be charged to the accounts of the option customers.

### 14.

It may be suggested that the Trustee should have "completed" the open options as "open contractual commitments" under 15 U.S.C. § 78fff(a) and (d), that is, by literal compliance with the option contracts, either by accepting physical share certificates against payment or delivering share certificates against payments.

Considering the "intricacies" (*SEC v. Aberdeen etc.*, 480 F.2d 1121, 1123 (3d Cir. 1973) of the statute, it is by no means clear that the option contracts

were "open contractual commitments" but they may be. Assuming that they are, it would seem that the Trustee "completed" the contracts because he recognized them as valid, noted their exercise, and acknowledged a money claim resulting therefrom. The option holders are not complaining; they treat the option contracts as "completed".

But if we assume that the option contracts were not "completed", the option customers of Weis cannot assert a wrong to them. They are not the class protected by the statutory provision, which applies *only* to contracts between "the debtor and another broker-dealer" and not to contracts between "the debtor and his customer" (480 F.2d at 1125). The reasons for this are explained in the cited *Aberdeen* opinion.

Further even if the Trustee had literally "completed" the contracts by accepting or delivering share certificates in kind, it would be doubtful that this would have affected the result here because, as in *Aberdeen,* "the securities may not be specifically identifiable property, but of course the transactions would be 'given effect' in computing the dollar value of the 'net equity' of the customer" (480 F.2d at 1126)—exactly what was done here.

### 15.

On the Trustee's appeal, that part of the order appealed from is reversed and the matter remanded for resolution in accordance with this opinion.

### B.

### 16.

On the cross-appeals of Sharp, Moody and Ray, in the light of the disposition of the Trustee's appeal, their cross-appeals are dismissed as moot.

### C.

### 17.

On the cross-appeal of Daum, several different matters appear to be raised.

(a) Daum asserts that his account should have been transferred to another broker before the "filing date". This assertion has no basis in fact. Daum asked for a transfer on May 24, 1973, which was the "filing date" (the request was not received, it appears, until May 29, 1973).

(b) Daum apparently caused Weis to sell options but, unlike all other options involved on this appeal, they were sold on the Chicago Board Options Exchange (CBOE) and not through members of the Association. When on May 24, 1973, the application was made by SIPC in respect of Weis, CBOE, under its Rules, "closed" the outstanding option contracts sold by Weis for Daum by substituting (in substance) another CBOE member in place of Weis as obligor on the open option contracts. This resulted in a $602.50 debit to Weis which, under the Weis-Daum agreement, was charged to the account of Daum. This seems plainly proper.

■ (c) Daum complains that all securities long in his account were not delivered to him in kind but that in lieu of some securities a cash credit was made by the Trustee to his account. In this respect, as the Bankruptcy Judge found, the Trustee was correct. Where there may be "specifically identifiable property" of many customers but not enough shares to permit delivery of such property, the statute directs a pro rata delivery, 15 U.S.C. § 78fff(c)(2)(C), and a credit of cash for any shortages, 15 U.S.C. § 78fff(c)(2)(B) and (f)(1).

(d) Daum complains also that because he did not receive all long shares in his account, he did not receive dividends and "rights" in respect of the undelivered shares. But, as has been seen in (c) above, the Trustee followed the statute and since Daum received a cash credit for the undelivered shares, he has no entitlement to dividends or "rights" in respect of those shares.

### 18.

On the cross-appeal of Daum, to the extent that the order of the Bankruptcy Judge dealt with the matters, that order is affirmed.

### D.

### 19.

On the cross-appeal of Lipow, two points are raised. The first is that his

"net equity" was not increased by a sufficient amount. Inasmuch as it has been already held that no increase in "net equity" is justified, this part of the cross-appeal of Lipow is dismissed as moot.

20.

The other point raised by Lipow· is that he was not delivered by the Trustee all of his long securities in kind, but instead was credited with cash. This same point has already been discussed in connection with the appeal of Daum and on this part of the cross-appeal the order of the Bankruptcy Judge is affirmed.

SO ORDERED.