**SECURITIES AND EXCHANGE COMMISSION**

v.

**ALBERT & MAGUIRE SECURITIES CO., INC., Robert M. Maguire, Andrew Horvat, Jr., Melvin M. Browndorf, Bertram J. Burak, Jaetano Peraisi.**

**Appeal of INDUSTRIAL VALLEY BANK AND TRUST COMPANY.**

No. 76–2451.

United States Court of Appeals, Third Circuit.

Argued June 8, 1977.

Decided July 27, 1977.

As Amended Aug. 18, 1977.

Ira P. Tiger, Susan L. Carroll, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.

Theodore H. Focht, Gen. Counsel, Securities Investor Protection Corp., Washington, D.C., for appellee, Securities Investor Protection Corp.; Wilfred R. Caron, Associate Gen. Counsel, William H. Seckinger, Senior Atty., Washington, D.C., of counsel.

Donald M. Collins, Margaret Mary Maguire, Waters, Fleer, Cooper & Gallager, Philadelphia, Pa., for appellee, Donald M. Collins, Trustee, Estate of Albert & Maguire Securities Co., Inc.; Waters, Fleer, Cooper & Gallager, Philadelphia, Pa., of counsel.

Before WEIS, STALEY and GARTH, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

A bank receiving an assignment of a customer's claim in a Securities Investor Protection Act liquidation may not be entitled to assume that preferred status when the equities are contraindicative. After a review of the circumstances in this, a case of first impression, we conclude that the district court did not err in relegating the Bank's claim to that of a general creditor and, accordingly, affirm.

In May, 1972, Joseph and Helen Gradus opened an account with Albert & Maguire Securities Company, Inc., providing that securities purchased were to be registered in their names and the proceeds of any sale were to be paid over to them by the broker. On July 12, 1972, Albert & Maguire purchased 1,000 shares of Pennsylvania Power & Light Company (PP&L) for the Graduses who paid the full purchase price, $100,000, on July 19, 1972. On July 25, 1972, PP&L issued 10 certificates, each for 100 shares, in the name of the Graduses, and delivered them to Albert & Maguire.

Instead of delivering the certificates to the Graduses, Albert & Maguire, using stock powers bearing forged signatures, sold the securities to a bona fide purchaser. The forged signatures were guaranteed by the Industrial Valley Bank who had no knowledge of the fraudulent conversion. PP&L had issued new certificates to the bona fide purchasers, and the proceeds of the sale were received by Albert & Maguire.

In the ensuing months, the Graduses continued to make unsuccessful demands upon the broker for the stock certificates. In addition to action brought against the broker by the Securities and Exchange Commission, the Securities Investor Protection Corporation on October 19, 1972 requested the district court to appoint a trustee under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.* The court granted the petition and the trustee took over the assets held by Albert & Maguire.

The Graduses submitted claims for the stock certificates to the trustee, PP&L, and the Bank. The Bank then obtained 1,000 shares of PP&L and delivered them to the Graduses along with an amount representing accrued dividends and counsel fees. The Bank's total expenditure was $108,-501.25, and in return it received an assignment of the Graduses' rights and claims. Pursuant to Bankruptcy Rule 302(d)(2), the Bank secured an order substituting it for the Graduses in their claim filed with the trustee. However, the trustee disallowed the Bank's asserted entitlement to the preferred status of a customer and accepted the claim as that of a general creditor.

The bankruptcy judge decided that the Graduses' assignment entitled the Bank to the benefits of customer status. The district court reversed, holding the Graduses, by the broker's fraudulent act, had lost only the evidence of their ownership, the certificates, not their stock interest, and the claim was not worth $108,501.25. The court decided that the Bank had been liable for this sum because of its signature guaranty which made possible the wrongful act of the debtor, and was therefore only a general creditor.

■ We have reviewed the general outline and purpose of the SIPA on earlier occasions. See *S.E.C. v. Aberdeen Securities Co., Inc.*, 526 F.2d 603 (3d Cir. 1975) (Aberdeen II); *S.E.C. v. Aberdeen Securities Co., Inc.*, 480 F.2d 1121 (3d Cir. 1973), *cert. denied, sub nom. Seligsohn v. S.E.C.*, 414 U.S. 111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973). In general terms, it may be said that the Act was intended to provide protection for brokerage house customers somewhat similar to that afforded bank depositors by the Federal Deposit Insurance Corporation. Property of the customers held by the broker and not specifically identifiable forms a single and separate fund. To meet claims of the customers, the Securities Investor Protection Corporation augments this fund by payments not to exceed $50,000 per customer. Assets owned by the brokerage house itself are available for satisfaction of general creditors and those claims of customers not fully reimbursed from the separate fund.

"Customers" are defined as persons "who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons . . . or pursuant to purchases, . . . and shall include persons who have claims against the debtor arising out of sales or conversions of such securities . . . ." 15 U.S.C. § 78fff(c)(2)(A)(ii).

■ The Bank and trustee have stipulated that "[t]he Graduses were 'customers' of the Debtor, as that term is defined in Section 6(c)(2)(A)(ii) of the Act, and were entitled to the protection and benefits which the Act affords to such cash customers." Though we do not rely upon this stipulation insofar as it purports to decide a legal issue, *Estate of Sanford v. Commissioner of Internal Revenue*, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20 (1939); *cf. United States v. Reading Company*, 289 F.2d 7 (3d Cir. 1961), we do agree with its interpretation. In our view, the Graduses did have a customer claim for the conversion of the stock certificates. However, further analysis is required to ascertain the status of the claim after assignment and its value.

The Bank contends that the Graduses' customer claim is freely assignable and retains its priority status thereafter. It relies on such bankruptcy cases as *Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 27 S.Ct. 178, 51 L.Ed. 436 (1907); *In re Dorr Pump & Mfg. Co.*, 125 F.2d 610 (7th Cir. 1942); and *In re Zipco, Inc.*, 157 F.Supp. 675 (S.D.Cal.1957), *aff'd sub nom. Bass v. Shutan*, 259 F.2d 561 (9th Cir. 1958).

*Shropshire* held that a claim for wages against a bankrupt was assignable and retained its statutory priority. There, the assignee apparently purchased the claims for what might be termed "new consideration." Emphasizing the statutory priority accorded debts for wages, the Court held this special status followed the claim rather than the claimant.

In *In re Dorr*, stockholders of a bankrupt who paid back wages owing to employees of the company were held to be entitled to the wage earners' priority, despite state law which made the stockholders liable for such obligations on default by the company. One point of distinction between *In re Dorr* and the one *sub judice* is apparent—by statute the stockholders became secondarily liable for the debt of the bankrupt company. Here, there is no such relationship between the bank and the debtor. Another difference is that *In re Dorr* was concerned with the priority of claims among creditors of the debtor to its property. Here, the claim is to SIPC contribution and to customers' property, not the debtor's, and accordingly other factors must be considered.

In our view, assuming applicability of bankruptcy law to this case,[1] although the Graduses' claim is assignable for value, we do not agree that the Bank has met the equitable qualifications necessary to establish priority. In passing on allowance of claims, the court exercises far reaching equitable powers to "sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939). Equity may sometimes require that a claim be disallowed or subordinated to all or certain other creditors. *Heiser v. Woodruff*, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946); 3A Collier On Bankruptcy ¶ 63.08. We, therefore, look at the circumstance leading to the assignment.

The SIPA was enacted for the protection of brokerage customers. In a loose, non-technical sense, it provides benefits to them somewhat similar to insurance against the broker's insolvency, although not against the vagaries of the market.[2] The Act offers no additional protection to the broker's general creditors beyond that in the Bankruptcy Act.

The Act specifically covers a broker's conversion of a customer's securities, and we have held that stock certificates may be the subject of conversion. *Reading Finance & Securities Co. v. Harley*, 186 F. 673 (3d Cir. 1911). If the customer had deposited with the broker stock certificates validly endorsed in blank and a conversion had occurred, PP&L probably would not have been obliged to issue or obtain replacement shares. Consequently, there could have been no responsibility on the part of the signature guarantor, and the Graduses' only claim would have been against the debtor. In that situation, they would have been entitled to claim from the trustee replacement of the shares of stock or their value as of October 19, 1972, the date when he took over Albert & Maguire's assets. The extent to which the claim could be satisfied would depend upon the size of the separate fund.

Here, however, because of the forgery, the Graduses, in addition to other rights, had a cause of action against PP&L. Under the Uniform Commercial Code, as adopted in Pennsylvania, Pa.Stat.Ann. tit. 12A, § 8–311, the issuer was liable to the Graduses and by virtue of Pa.Stat.Ann. tit. 12A, § 8–404(2) was required to issue new certificates. In turn, the Bank would have been called upon to reimburse PP&L for its loss.[3] Both PP&L and the Bank were solvent, and without doubt both could have fulfilled their obligations had judgments been entered.

Thus, the Graduses were in the enviable position of having two avenues for compensation open to them—one, under SIPA against the trustee for partial reimbursement;[4] the other, under the U.C.C. for payment in full, diminished only by possible expenditures for an attorney's services. Not surprisingly, the Graduses chose the latter option. The out-of-pocket loss facing them, therefore, was only the cost to be incurred in having PP&L issue new certificates—not the value of the stock itself.

1. 15 U.S.C. § 78fff(c)(1) provides that except as inconsistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with Chapter X and those portions of Chapters I to VII which would be made applicable under the terms of 11 U.S.C. § 502.

2. SIPC insists that it does not function as an insurer since it collects flat assessments rather than premiums computed on an actuarial basis. It also points out other differences between its operations and that of insurance companies. The distinction is not important in this case and we use the insurance analogy as a convenient way to describe some of the protection features of the Act.

3. The Bank argues that there were a number of defenses that it might have invoked against PP&L. We need not evaluate them at this point. The Bank settlement for the full amount, however, not unnaturally leads one to surmise that its defenses were not particularly formidable.

4. The SIPC contribution and a pro rata share of the separate fund would not have been adequate to pay the claim in full.

If the Bank's claim had been accorded customer priority, the payment would have been approximately $84,000. As a general creditor, however, the Bank will only realize about $16,000.

When the Bank chose to deliver stock to the Graduses, it did so because of its obligation to PP&L, which in turn was liable to the Graduses. The Bank did nothing more than satisfy its very real exposure to liability because of its guaranty of the endorsements. Thus, the claim's merits were quite different than if the Bank had purchased the Graduses' interest with funds that it was not otherwise required to expend. In this sense, no "new consideration" passed, and the policy which preserves the priority of wage claims on assignment is not applicable. Transferring priority protects the worker who is enabled to liquidate his claim against a bankrupt more expeditiously. 3A Collier On Bankruptcy ¶ 64.205. That basic consideration may apply to a customer in other SIPA proceedings but is not pertinent here.

Because the debtor was responsible for the forgery, the district court recognized the Bank's claim against the general estate but not against the single and separate fund. If the court had extended customer priority to the Bank, it would have received a greater recovery on its claim than it would have as a general creditor. That increase, however, would have been at the expense of the customers and SIPC since payment to the Bank would have decreased the amount available to meet claims of the customers. The district court would not permit this "because it would result in an inequitable distribution of the bankrupt estate, inconsistent with the Congressional purpose." We find no error in this appraisal of the equities and, accordingly, agree that, in the circumstances present here, the assignment did not serve to transfer the Graduses' preferred status to the Bank.

Moreover, in the unlikely event that the Graduses had chosen to pursue their claim against the trustee, the Bank would have fared no better in the end.

The statute [5] gives the trustee the option of satisfying customer claims for securities either by paying in cash, or after court authorization, by delivering securities of the same description "if and to the extent available." In addition, the trustee can condition delivery of securities upon execution of assignments and affidavits by the claimant. Accordingly, the bankruptcy court conceivably might consider that the Commercial Code remedy against PP&L made securities "available" to satisfy the Graduses' claim. The court could require the customers to execute appropriate documents enabling the trustee to institute legal proceedings against PP&L should it fail to issue new stock certificates on demand.

If the bankruptcy court believed that too much delay would be involved in this procedure, it might have allowed the trustee to purchase securities on the open market or pay cash to the customers. In that event, also, the customer would furnish assignments to the trustee who could then prosecute the Graduses' claim against PP&L.

The Act specifically authorizes the trustee to receive affidavits and assignments from customers in such form as he determines. 15 U.S.C. § 78fff(g). Nothing in the statutory language restricts the form or purpose of the assignments to use against the debtor. Proper application of the statute requires that this provision be construed liberally in order to provide adequate reimbursement for customers. If the trustee recovers on customers' claims against third parties, the single and separate fund is augmented and additional money becomes available to satisfy claims of all the customers.

---

5. 15 U.S.C. § 78fff(g) provides in relevant part:
 "It shall be the duty of the trustee to discharge promptly . . . all obligations of the debtor to each of its customers relating to . . . securities . . . by the delivery of securities or the effecting of payments to such customer . . . . For that purpose the court among other things shall . . .
 (2) in respect of claims relating to . . . securities of a class and series of an issuer . . . authorize the trustee to deliver securities of such class and series of and to the extent available . . . .
 Any . . . delivery of property . . . may be conditioned upon the trustee requiring claimants to execute in a form to be determined by the trustee, appropriate receipts, supporting affidavits, and assignments . . . ."

Upon payment of benefits, the trustee and SIPC stand not in the shoes of the debtor, as the Bank contends, but, rather, in those of the customer. If the analogy to insurance is followed, upon payment to a customer, SIPC becomes subrogated to the customer's rights against third parties.

The authority of a trustee in an SIPA proceeding is set out in 15 U.S.C. § 78fff(b)(1):

"A trustee appointed under section 78eee(b)(3) . . . shall be vested with the same powers and title with respect to the debtor and the property of the debtor, and the same rights to avoid preferences, as a trustee in bankruptcy and a trustee under chapter X of the Bankruptcy Act have with respect to a bankrupt and a chapter X debtor." ·

A Chapter X trustee:

"[I]f authorized by the judge, shall have and may exercise such additional rights and powers as a receiver in equity would have if appointed by a court of the United States for the property of the debtor." Section 187 of the Bankruptcy Act, 11 U.S.C. § 587.

As Collier On Bankruptcy comments:

"Thus, the SIPA trustee, upon order of the court, will have the combined powers of a trustee in ordinary bankruptcy, a Chapter X trustee and a federal equity receiver. In making available the additional rights and powers of a receiver in equity, it was the Congressional purpose to arm the trustee with even greater powers than those of a trustee in bankruptcy." [footnotes omitted] 3A Collier On Bankruptcy ¶ 60.85[2].

In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), the Court of Appeals affirmed the authority of a trustee of a stockbroker to bring a Rule 10b–5 suit against a third party. In that case, the bankrupt had used customer funds to purchase securities for its own account. The defendant was another brokerage firm which had received the funds and purchased stock for the bankrupt. The court held the transfers voidable, and the trustee recovered the funds. The court relied in part upon § 60(e) of the Bankruptcy Act, 11 U.S.C. § 96(e), one of the 1938 amendments, which authorized recovery for transfers of property which would have formed part of the single and separate fund of a stockbroker debtor. Thus, even before the enactment of the SIPA, the concept of the trustee's authority to recover from third parties for the benefit of the customer fund had been established.

 ·It is important to bear in mind that the single and separate fund is not composed of assets of the debtor, but rather, property of the customers. 15 U.S.C. § 78fff(c)(2)(B). The trustee is charged with administering the fund to provide maximum distribution to customers. If a customer entitled to share in the fund has a cause of action against a third party for the same property, the trustee should be entitled to take an assignment of the claim in order to avoid an unnecessary drain on the fund. Therefore, we do not accept the Bank's view of the restricted nature of the trustee's authority. He is not limited to standing in the shoes of the debtor.[6] See 4A Collier On Bankruptcy ¶ 70.90[1].

Since the trustee can sue a third party after making payment to a customer, had the Graduses' claim initially been submitted to the trustee, PP&L, and then the Bank, would ultimately bear the loss, with recourse only as a general creditor of the debtor. On this basis, also, there would be no reason for the trustee to pay the Bank in the first instance.

The.judgment of the district court will be affirmed.

---

**6.** For a somewhat analogous situation, *see* the discussion of the rights of the FDIC as receiver to bring suit against brokerage firms for 10b–5 and stock exchange rule violations. *Landy v.* *Federal Deposit Insurance Corporation*, 486 F.2d 139 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).