In the Matter of BEVILL, BRESLER & SCHULMAN, INC., Debtor (Three Cases).

Richard W. HILL, Trustee under the Securities Investor Protection Act for the liquidation of Bevill, Bresler & Schulman, Inc., Plaintiff,

v.

SPENCER SAVINGS & LOAN ASSOCIATION, a New Jersey state chartered savings institution, and XYZ Co. (said name being fictitious), Defendant–Third Party Plaintiff,

v.

CHASE MANHATTAN BANK—LONDON DIVISION, Third Party Defendant.

Richard W. HILL, Trustee under the Securities Investor Protection Act for the liquidation of Bevill, Bresler & Schulman, Inc., Plaintiff,

v.

FIRST NATIONAL BANK OF SKOKIE, a national bank, and XYZ Co. (said name being fictitious), Defendant.

Richard W. HILL, Trustee under the Securities Investor Protection Act for the liquidation of Bevill, Bresler & Schulman, Inc., Plaintiff,

v.

HAWTHORNE SAVINGS & LOAN ASSOCIATION, a California state chartered savings institution, and XYZ Co., (said name being fictitious), Defendant.

Civ. A. No. 85–2224.
Bankruptcy No. 85–0180(SIPA).
Adv. Nos. 87–530, 87–532 and 87–536.

United States District Court, D. New Jersey.

March 15, 1988.

---

882

McCarter & English by Hayden Smith, Jr. and Joseph Lubertazzi, Jr., Newark, N.J., for Richard W. Hill, trustee under the Securities Investor Protection Act for the liquidation of Bevill, Bresler & Schulman, Inc., William H. Horton, of counsel.

Securities Investor Protection Corp. by Theodore H. Focht, Gen. Counsel, Washington, D.C. (Michael E. Don, Deputy Gen. Counsel, Josephine Wang, Asst. Gen. Counsel, of counsel).

Ross & Hardies by Helen Davis Chaitman, Somerset, N.J., and Ross & Hardies by Janet S. Baer, Donald C. Pasulka, Chicago, Ill., for Spencer Sav. & Loan Ass'n and Hawthorne Sav. & Loan Ass'n.

Sonnenschein, Carlin, Nath & Rosenthal, by Harold C. Hirshman, Jacob I. Corre, Chicago, Ill., for First Nat. Bank of Skokie.

## OPINION

DEBEVOISE, District Judge:

### I.  INTRODUCTION

On April 8, 1985, the Securities & Exchange Commission ("SEC") filed a complaint against, *inter alia*, Bevill, Bresler & Schulman Inc. ("BBS"). On April 10, 1985, this court appointed Richard Hill, Esq. a temporary receiver for BBS. The temporary receiver took control of all securities still in the actual or constructive possession of BBS.

On May 2, 1985, an involuntary bankruptcy petition was filed against BBS. On May 6, 1985 the Securities Investor Protection Corporation ("SIPC") filed an application for a protective decree pursuant to 15 U.S.C. section 78eee of the Securities Investor Protection Act ("SIPA"). On May 8, 1985, this court entered an order adjudicating that the customers of BBS were in need of protection under SIPA and appointed Mr. Hill as trustee under SIPA for the liquidation of BBS.

Many of the securities possessed by BBS on April 10, 1985 (and therefore taken control of by the trustee) were being held in safekeeping for BBS' customers. Those customers will not receive the full value of their certificates; under SIPA, they must share in a *pro rata* distribution. However, not all BBS customers quietly accepted their fate. During the two-day period between the filing of the SEC complaint and the appointment of the temporary receiver, BBS transferred, *inter alia,* 18 Eurodollar Certificates of Deposit ("certificates" or "CDs") in the face amount of $19,000,000 from a BBS safekeeping account at a bank in London to an account of Spencer Savings and Loan Association ("Spencer") at another London bank. Other customers benefitted from similar transfers.

The trustee has filed complaints against Spencer and eight other financial institutions to recover such transferred certificates or their proceeds.[1] The complaints, which are similar, each contain two main counts. The first count alleges that the "filing date" of the liquidation proceeding is April 8, 1985, and that the certificates are recoverable by the trustee as voidable post-petition transfers pursuant to 11 U.S.C. section 549. The second count, pled in the alternative, seeks recovery of the certificates as voidable pre-petition transfers pursuant to 11 U.S.C. section 547.

On November 12, 1987, I directed the trustee and the Eurodollar defendants to file cross-motions for partial summary judgment on three issues:

1. What is the filing date of the liquidation proceeding? If April 8, 1985 is determined to be the filing date, then the Eurodollar actions are ones to avoid postpetition transfers pursuant to 11 U.S.C. section 549, and the Eurodollar defendants will have limited defenses. If the filing date is determined to be subsequent to the period April 8–10, 1985, the actions are ones to avoid preferential pre-petition transfers pursuant to 11 U.S.C. section 547, and the defendants will be allowed to assert the defenses to such an action contained in section 547(c).

2. When is the customer property valued for purposes of 15 U.S.C. section 78fff–2(c)(3)? SIPA section 78fff–2(c)(3) allows avoidance of a postpetition transfer only where "customer property is not sufficient to pay in full" all customer-related claims. The defendants have denied the trustee's allegation that the BBS customer property is insufficient to pay customer-related claims. Thus, customer claims and customer property must be valued to determine whether avoidance is allowed. Defendants and the trustee differ on the date as of which such a valuation should take place.

3. What effect should be given to the English law defense raised by the Eurodollar defendants? The defendants contend that English law precludes a finding that the certificates are voidable under either section 547 or 549.

The trustee has moved for partial summary judgment on the first and second issues, and has moved to strike the English Law defense asserted by some of the Eurodollar defendants. Spencer Savings and Loan Association ("Spencer"), joined by two of the other Eurodollar defendants, Hawthorne Savings and Loan Association and the First National Bank of Skokie, has moved for summary judgment dismissing the complaint based on the English law defense and based on Spencer's additional

---

1. Two of the actions have settled. The remaining Eurodollar defendants are Spencer, First National Bank of Skokie, First Savings & Loan Association of Perth Amboy, Hawthorne Savings & Loan Association, Westbury Federal Savings & Loan Association, Bay Ridge Federal Savings & Loan Association, and Yonkers Savings & Loan Association.

contention that avoidance of the transfers would be an unconstitutional taking under the Fifth Amendment to the United States Constitution. These cross-motions are now before the court.

## II. FACTS

The briefs and affidavits submitted by the three Eurodollar defendants that have participated in the instant motions refer primarily to facts concerning Spencer but not to the other defendants. The following facts are either undisputed or, having been asserted by Spencer,[2] are assumed to be true only for the purposes of these cross-motions. The material facts are not in dispute.

### A. *The Parties*

Spencer is a New Jersey chartered savings and loan association. Prior to May 8, 1985, BBS was a licensed broker-dealer doing business in the State of New Jersey. Richard W. Hill is the trustee under SIPA for the liquidation of BBS.

### B. *Spencer's Relationship with BBS*

From approximately 1983 to 1985, Spencer purchased securities and debt instruments through BBS, utilizing the services of its broker at BBS, John Zeimitz ("Zeimitz"). Spencer followed an investment policy under which it took physical possession of all securities it purchased.

In order to lock in a slightly higher interest rate than was available on domestic certificates of deposit, on occasion Spencer purchased Euro CDs issued in London. Spencer purchased Euro CDs only from the 25 largest banks in the world, and only Euro CDs that were issued in, and governed by the laws of, England. When a representative of Spencer first talked with BBS regarding the purchase of Euro CDs, Zeimitz explained that Euro CDs are physical securities which cannot be taken out of England, and must be presented to the issuer in London for payment. Hence, Spencer could not follow its standard policy

and take physical possession of the Euro CDs which it purchased through BBS.

As a service to its customers, and in order to facilitate its own sale of Euro CDs, BBS established a safekeeping account at Chase so that Chase could safekeep the Euro CDs of the customers of BBS.

Spencer contends that Zeimitz believed, and advised Spencer, that Chase maintained a separate safekeeping account for Spencer pursuant to the telexed instructions which BBS sent Chase concerning each Euro CD purchased by Spencer. Spencer contends that in reliance upon these representations, it purchased Euro CDs from BBS, and that it would not have purchased Euro CDs from BBS without BBS' assurance that those Euro CDs were being maintained by Chase in a separate safekeeping account for Spencer.

### C. *The Nature of English Euro CDs*

Each of the Euro CDs purchased by Spencer was issued in the London market. The specific language contained in the Euro CDs varied slightly. Many of the Euro CDs contained the following statement: "All of the rights and obligations herein shall be governed by and construed in accordance with English law." Other Euro CDs included a specific reference to the issuer in their statements of the governing law.

The volume of trading in Euro CDs is vast. Spencer contends that as of October 1986, there were $100 billion of Euro CDs outstanding in the London market alone.

Euro CDs cannot be registered in a purchaser's name. While the Euro CDs state on their face that they are "negotiable," they are not negotiable as that term is commonly used in the United States. The Euro CDs state on their face that they are payable upon maturity when presented to the issuer by "a Recognized Bank in the United Kingdom." This means that the issuer will not redeem the Euro CDs unless they are presented by one of the banks recognized by the Bank of England, pursuant to English statute. Moreover, a Recog-

**2.** Although all three of the above-named defendants have joined in Spencer's motion, I shall refer only to Spencer when addressing the positions of those defendants.

nized Bank will not accept a Euro CD from a customer to be presented to the issuer for redemption unless the Bank is satisfied that the customer is the rightful owner of the Euro CD.

Spencer contends that the manner in which Euro CDs are held in London is fairly uniform. A savings and loan which purchases Euro CDs through its securities broker in the United States will utilize the safekeeping services provided by that broker at one of the London institutions such as Chase. Spencer contends that it is impracticable if not impossible for institutions like itself to hold their own certificates.

Spencer contends that a holding that certificates safekept in the above manner become the property of a SIPA trustee upon the broker's liquidation will substantially diminish the Euro CD market, and would have a substantial adverse impact upon savings and loan associations throughout the United States by discouraging their investment in Euro CDs. Although the trustee vigorously disputes this contention, arguing that it is relatively simple and inexpensive for such institutions to open their own safekeeping accounts, and that some institutions in fact do so, I shall assume Spencer's allegation in this regard to be true for the purposes of this motion.

### D. *Facts Relating to this Proceeding*

On Sunday, April 7, 1985, at 10:20 p.m., Bevill, Bresler & Schulman Asset Management Corporation ("AMC"), an affiliate of BBS, filed a voluntary chapter 11 petition in this court. On April 8, 1985 the Securities and Exchange Commission (the "SEC") filed a complaint against BBS, AMC and several other affiliated corporations and partnerships, alleging violations of the antifraud provisions of the federal securities laws.

Zeimitz called Orofino at Spencer on April 8th and advised him, in view of the confusion concerning the role and activities of AMC, to move the 18 Euro CDs then being held for Spencer at Chase to an institution with which BBS had no relationship.

On that same day, Orofino arranged for the Euro CDs to be delivered to the Federal Home Loan Bank's safekeeping account at Bankers Trust Company in London ("Bankers Trust"). After speaking with Orofino, Zeimitz, some time after noon on April 8, 1985, instructed the back office personnel at BBS to telex Chase instructing Chase to transfer all of Spencer's Euro CDs "free" to Bankers Trust for the account of Spencer. On April 9, 1985, at 7:20 p.m., BBS telexed those instructions to Chase. Chase completed delivery of the Euro CDs to Bankers Trust at 4:30 p.m. London time on April 10, 1985 (10:30 a.m. Eastern Standard Time).

Late in the afternoon of April 10, 1985, approximately six hours after Bankers Trust received possession of Spencer's Euro CDs, Richard W. Hill was appointed temporary receiver of BBS and three affiliated corporations in the SEC action.

On May 2, 1985, a number of creditors of BBS filed an involuntary petition for relief against BBS under the Bankruptcy Code. On May 6, 1985 the Securities Investor Protection Corporation filed an application for a protective decree pursuant to Section 78eee of SIPA. On May 8, 1985, by order of this court, Hill was appointed trustee for the liquidation of BBS under SIPA.

With respect to each of the Euro CDs of Spencer delivered to Bankers Trust, Spencer received payment from the issuer within a few days after its maturity date.

On February 11, 1987, the trustee filed his complaint against Spencer alleging that the transfer of the certificates was a postpetition transfer or a voidable prepetition transfer. The complaint seeks a return of the Euro CDs or their proceeds.

### III. DISCUSSION

#### A. *Summary Judgment Standards*

In order to prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986), *rev'g.* 723 F.2d 238 (3d Cir. 1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The Supreme Court recently explained that in evaluating the evidence presented, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita,* 106 S.Ct. at 1356. All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord,* 624 F.2d 1169, 1181 (3d Cir.1980).

### B. *Overview of SIPA*

Congress enacted SIPA in response to customer losses that resulted from stockbroker failures in 1969 and 1970. The purposes of SIPA are

> to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

S.Rep. No. 1218, 91st Cong., 2d Sess., at 4 (1970). SIPA created the Securities Investor Protection Corporation ("SIPC") and, among other things, established procedures for liquidating financially troubled broker-dealers who are members of SIPC.[3]

Under SIPA section 78eee(a)(3), a SIPA liquidation is initiated by SIPC's filing of an application for a customer protective decree in a federal district court. Notwithstanding the special protection afforded to customers, courts have uniformly recognized that a proceeding under SIPA essentially is a bankruptcy liquidation remodelled to achieve the special purposes of SIPA. *See, e.g., SIPC v. Ambassador Church Finance/Development Group, Inc.,* 788 F.2d 1208, 1210 (6th Cir.), *cert. denied sub nom. Pine Street Baptist Church v. SIPC,* —— U.S. ——, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986); *Matter of Bevill, Bresler & Schulman, Inc.,* 59 B.R. 353, 366–67 (D.N.J.1986). The statute provides that, to the extent consistent with SIPA, a SIPA liquidation "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of the Bankruptcy Code." SIPA section 78fff(b).

### C. *Date of Filing*

SIPA section 78fff–2(c)(3) permits the trustee to avoid a postpetition transfer of customer property to a customer where "customer property is not sufficient to pay in full" all customer-related claims and to the extent that the transfer "is voidable or void under the provisions of Title 11." 15 U.S.C. section 78fff–2(c)(3). Sections 547 and 549 of the Bankruptcy Code authorize, respectively, avoidance of certain prepetition and postpetition transfers of "property of the estate." Thus, by virtue of SIPA sec. 78fff–2(c)(3), sections 547 and 549 of the Code apply to this SIPA liquidation.

Section 549 of the Code authorizes the trustee to avoid the transfers at issue in this action if "customer property is not sufficient to pay in full" all customer-related claims and if the transfers were made after "commencement of the case." If the transfers at issue took place before "commencement of the case," then they are avoidable, if at all, under section 547, which

---

**3.** SIPC is a non-profit corporation whose members include most interstate broker-dealers. Membership in SIPC is automatic upon registration as a broker or dealer with the SEC under section 15(b) of the Securities Exchange Act of 1934. SIPA section 78ccc. SIPA requires SIPC to establish, via assessments upon its members, a fund to provide "relief to certain classes of customers." *SEC v. Parker, Wilbur & Co.,* 498 F.2d 978, 983–85 (2d Cir.1974). However, because SIPA contemplates that customers' claims will be satisfied to the maximum extent possible from the assets of the defunct member firm, SIPC's role is carefully delineated, and the corporation does not attempt to make all customers whole.

allows avoidance only of certain classes of prepetition transfers. The trustee has moved for partial summary judgment determining that the applicable "commencement" date is April 8, 1985, the date of filing of the SEC complaint. The defendants oppose this motion, contending that the commencement date is April 10, 1985 or later. For the reasons stated below, I find that the applicable date is April 8, 1985.

Under Title 11 of the Bankruptcy Code, the date of "commencement of the case" is the date of the filing of the bankruptcy petition. *See* 11 U.S.C. section 301 ("a voluntary case under a chapter of this title is commenced by the filing ... of a petition under such chapter"); 11 U.S.C. section 303(b) ("an involuntary case against a person is commenced by the filing ... of a petition under Chapter 7 or 11 of this title"). By virtue of 15 U.S.C. section 78fff(b), when applying the provisions of the Bankruptcy Code in a SIPA liquidation, references to the date of the filing of the bankruptcy petition are deemed to be references to the "filing date" as defined in SIPA.

Thus, the reference in section 549 of the Bankruptcy Code to the "commencement of the case" must be understood to be a reference to the SIPA "filing date." Accordingly, this action is properly brought under section 549 (as opposed to section 547) only if the transfer at issue took place after the SIPA filing date.

SIPA spells out how the "filing date" is to be determined. In relevant part, 15 U.S. C. section 78*lll* (7) provides:

The term "filing date" means the date on which an application for a protective decree is filed under section 78eee(a)(3) of this title, except that—

(A) if a petition under Title 11 concerning the debtor was filed before such date, the term "filing date" means the date on which such petition was filed;

(B) if the debtor is the subject of a proceeding pending in any court or before any agency of the United States or any State in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term "filing date" means the date on which such proceeding was commenced....

The statutory definition thus contemplates fixing the filing date on the date of an application for a protective decree, and relating back to an earlier date if an event specified in 15 U.S.C. section 78*lll* (7) occurred prior to the filing of the application for a protective decree. *See Securities and Exchange Commission v. John E. Samuel & Co.*, CCH Fed.Sec.L.R. paragraph 93, 720 (S.D.N.Y.1973) [Available on WESTLAW, 1973 WL 361]; *Securities & Exchange Commission v. Aberdeen Securities Co. Inc.*, 480 F.2d 1121 (3d Cir.1973), *cert. denied sub nom. Seligsohn v. SEC*, 414 U.S. 111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); 1 *Collier on Bankruptcy*, para. 5.08, p. 5–69 (15th Ed.1985).

In this case, BBS has been the lucky beneficiary of all three of the above-mentioned events specified in SIPA section 78*lll* (7). The SEC commenced an action against BBS in this court on April 8, 1985, pursuant to which a temporary receiver for BBS was appointed on April 10, 1985; an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against BBS on May 2, 1985; and SIPC filed an application for a protective decree on May 6, 1985.

If not for prior events, May 6, 1985 would be the filing date under section 78*lll* (7) because that is the date of SIPC's filing of an application for a protective decree. However, the filing of an involuntary petition under Chapter 7 on May 2 and the SEC's filing of an action against BBS on April 8 (pursuant to which a receiver was appointed) require relation back to one of those two dates.

The issue is which date is appropriate. 15 U.S.C. section 78*lll* (7) and its legislative history are silent on which date to apply when both exceptions to the relation back rule are apparently applicable.

I must choose the appropriate date in light of the statute as a whole. When reviewing a comprehensive statutory enactment, a court must interpret each section in such a fashion as "to preserve an overall

sense and design, in light of the policies sought to be achieved." *In Re Stable Mews Associates, Inc.*, 41 B.R. 594, 599 (Bankr.S.D.N.Y.1984). If a statute is susceptible to two meanings, the court should choose the interpretation "that gives full effect to all provisions of the statute." *United States v. Fields*, 783 F.2d 1382, 1384 (9th Cir.1986).

SIPA envisions an orderly liquidation of the debtor, and equitable treatment of customers. *See, e.g., Matter of Bevill, Bresler & Schulman Inc.*, 59 B.R. 353 (Bankr.D.N. J.1986). The relation back provision of 15 U.S.C. section 78*lll* (7) is, in part, an attempt by Congress to preclude the race to the broker-dealer that might otherwise occur when customers become concerned for the safety of their securities.

Certain events involving a broker-dealer obviously result in customer concern for the safety of securities, even though the securities are held in safekeeping. Such events include those specified in SIPA section 78*lll* (7). *See, e.g., Securities Investor Protection Corporation v. Barbour*, 421 U.S. 412, 422–23, 95 S.Ct. 1733, 1739, 44 L.Ed.2d 263 (1975) ("the mere filing of an action predicated upon allegations of financial insecurity might often prove fatal" to the business of a broker). SIPA's avoidance section, 15 U.S.C. section 78fff–2(c)(3), promotes equal treatment of customers by voiding transactions that, because they result from such customer concern and the "race to the courthouse," have the effect of granting preferential treatment to any one customer. SIPA provides for *pro rata* distribution of customer property, including proceeds from avoidance actions, in satisfaction of customer claims. *See* Sen.Rep. No. 763, 95th Cong.2nd Sess. p. 13, *reprinted in* 1978 U.S.Code Cong. & Admin. News, p. 764, 776.

By providing that the filing date "relates back" to the date of either the filing of a bankruptcy petition or the filing of an action seeking the appointment of a receiver, Congress clearly determined that either of those events is sufficiently alarming to cause a race to the broker-dealer that should be prevented by the avoidance pro-

visions of the Bankruptcy Code. If both events occur for a particular broker-dealer, it is only logical to assume that Congress anticipated that the "race" would start on the earlier date. Thus, fixing the filing date on the earlier of the two dates—here, on April 8, 1985—appears to satisfy the Congressional intent to allow avoidance of all transfers that occur after the race begins.

This conclusion is buttressed by the facts of this case. During the period between the April 8, 1985 commencement of the SEC action and the April 10, 1985 appointment of the temporary receiver, there were "free" deliveries of securities to BBS customers, including those to Spencer and the other Eurodollar defendants. Of the hundreds of other BBS customers, some, like Spencer, managed to win physical possession of securities prior to appointment of the temporary receiver. Others did not, and have been forced to participate in SIPA's *pro rata* distribution scheme. A holding that the post-April 8 transfers are postpetition transfers and are voidable if the other requirements of section 549 are met will further the SIPA policy of equal treatment of customers and will nullify the preferential treatment that certain customers might otherwise receive.

■ I am not persuaded by Spencer's arguments that the court should fix a later filing date. First, Spencer contends that the appropriate date is the date of "commencement of the case" as defined in the Bankruptcy Code, and points out that I have already held that commencement of the case occurred on May 8, 1985. *See Cronin & Marcotte, Inc. v. Bevill, Bresler & Schulman, Inc.*, Transcript dated November 18, 1985. This argument ignores SIPA section 78fff(b), which equates "commencement of the case" with the SIPA "filing date." The argument also ignores the fact that the November 18, 1985 ruling only determined the date of "commencement of the case" for the purposes of the automatic stay provisions of section 362(a) of the Bankruptcy Code. In making that determination, I explicitly held that the filing date under SIPA section 78*lll* (7) did

not apply to section 362(a) of the Code. *See* Transcript at 30. I did not hold that the phrase "commencement of the case" means May 8, 1985 for all purposes of the SIPA litigation.

■ To be sure, both section 549 and section 362(a) of the Code refer to "commencement of the case," and if I had applied the definitional provision in SIPA section 78fff(b) to Code section 362(a) in the same manner that I am applying it to Code section 549, "commencement of the case" for purposes of the stay would have occurred on April 8, 1985. However, application of the SIPA filing date to the automatic stay in section 362 would have been improper for at least two reasons. First, section 549 applies to SIPA liquidations only by reason of SIPA section 78fff(b), which provides that certain chapters of Title 11, including section 549, apply to SIPA liquidations. Section 78fff(b) also provides that in applying the Bankruptcy Code provisions to the SIPA liquidation, any reference in the Code to the filing date of the bankruptcy petition is taken to mean the filing date under SIPA. Section 362(a) applies to a SIPA liquidation by its own terms, not only because of the tying-in provision in section 78fff(b). The subsection provides that "an application filed under section 301, 302 or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay...." Because section 362(a) applies to SIPA liquidations by its own terms, and because it applies to title 11 bankruptcies as well as SIPA liquidations, it is reasonable to treat the provision as using a single definition for "commencement of the case," whether the case is a straight bankruptcy or a SIPA liquidation, and it is reasonable to look to the Bankruptcy Code for that definition.

The second reason it would have been improper to apply the SIPA filing date to the section 362(a) stay is that such a definition of "commencement of the case" would result in a retroactive stay of actions brought before the actual filing of the SIPA application. Persons who sued the debtor in the period between the filing of

the receivership action and the filing of the SIPA action would, as of the commencement of the SIPA proceeding, automatically be in violation of section 362(a)(1). such a result seems nonsensical, and should be avoided. More than one court has found that the Bankruptcy Code does not authorize courts to impose retroactive stays. *See In re Lashley,* 825 F.2d 362, 364 (11th Cir.1987), and case cited therein.

None of these reasons for fixing the date of the section 362(a) stay on the date of "commencement of the case" apply here. The very provision in SIPA that authorizes this avoidance action requires use of the SIPA filing date. Use of the SIPA filing date in an avoidance action will not lead to nonsensical results.

■ Defendants also argue that Congress intended the "filing date" to be fixed on the date the public "is reasonably placed on notice of the debtor's [precarious] financial condition[,]" and that from April 8 until this court's appointment of the trustee on April 10, 1985, BBS was, pursuant to instructions from the SEC, operating "business as usual" and so advising its customers. Because, Spencer argues, the world was not on notice of BBS' financial condition until April 10, 1985 at the earliest, it would be an unwarranted expansion of the trustee's avoidance powers to allow avoidance as postpetition transfers any transfers that occurred before that date.

This argument suffers from at least two serious flaws. First, Spencer has offered no evidence to support its contention that the SEC instructed BBS' brokers to inform their customers that BBS was operating "business as usual." Spencer merely asserts, without support, that

> On April 8, 1985, a meeting was held at BBS while representatives of the SEC were on the premises, at which time all of the BBS brokers (presumably upon the instructions of the SEC) were assured that the AMC filing did not affect BBS and that BBS was to conduct business as usual.

Zeimitz deposition at 39–42, Spencer Rule 12G statement, paragraph 35. Spencer fails to reveal the factual basis for its

"presumption" that any instructions given to the BBS brokers came from representatives of the SEC. There appears to be no such factual basis. Zeimitz, defendants' chief affiant for these motions, testified that he did not even know for a fact that SEC representatives were at the BBS premises in April 1985.

Spencer contends that "even *after* the SEC filed its Complaint against BBS, both SIPC and the SEC *encouraged* the customers of BBS to believe that BBS was *not* the subject of a liquidation proceeding and that customers should continue to do business with BBS as usual." This allegation is unfounded. On the evening of April 7, 1985, representatives of the SEC, BBS and various other parties appeared before this court. At that time, Mr. Ira Lee Sorkin indicated that, although the SEC had no factual basis to seek the appointment of a receiver with respect to BBS, the SEC was preserving its right to seek a freeze on the transfer of assets of BBS and the appointment of a receiver. During the evening session of proceedings before this court on April 8, 1985, the SEC moved, unsuccessfully, for the appointment of a receiver for BBS, and filed a complaint. In addition to seeking the appointment of a receiver for BBS, the complaint sought an order restraining and enjoining

all defendants (including BBS, Inc.) ... directly or indirectly, from transferring, setting off, receiving, changing, selling, pledging, assigning or liquidating or in any way disposing or withdrawing assets or property owned by, controlled by, or in the possession of the defendants until further Order of the Court.

Defendants' suggestion that the world was not given any notice of BBS' impending financial problems is also meritless in light of the fact that the April 7, 1985 filing of AMC's chapter 11 proceeding and the April 8, 1985 filing of the SEC complaint were headline news on April 9, 1985. *See* Affidavit of Hayden Smith, Jr. Indeed, Spencer requested transfer of its certificates within hours of the SEC's filing of its complaint, and has offered no reason for its actions to rebut the obvious inference that it was reacting to the bad news about BBS.

Moreover, SIPA clearly does not allow a court to set a filing date according to its opinion of the circumstances surrounding the liquidation. As the trustee points out, a defendant's lack of notice or knowledge is irrelevent in a postpetition avoidance action. *See* 11 U.S.C. sec. 549(b); *In re Bridges Enterprises, Inc.*, 62 B.R. 300 (Bankr.S.D.Ohio 1986). Determination of the filing date must be made with regard to the statute alone.

In further support of a filing date later than April 8, 1985, Spencer asserts that:

If this Court holds that any transfer after the filing of an SEC complaint (whatever the relief sought by the SEC) is a voidable *per se* postpetition transfer, the effect will be to force the liquidation of the brokerage firm involved. No customer of a brokerage firm which is the subject of an SEC complaint will continue to do business with that firm the moment the customer learns of the filing of an SEC complaint. Thus, even in cases such as the present one where the SEC sought as of April 8 and 9, 1985 to keep the firm operational, the SEC complaint will force liquidation of the brokerage firm's business. The ultimate consequence of such a result will be to divest the SEC of the discretionary power granted to it by Congress to determine, based on its administrative expertise, whether the firm can survive or whether the firm must be the subject of a SIPA liquidation proceeding.

As noted above, defendants have not put forth a scrap of evidence that SEC at any time after the filing of the complaint sought "to keep the firm operational...." Defendants' argument also mischaracterizes the trustee's position. The trustee does not seek a holding that any transfer after the filing date of an SEC complaint is a voidable *per se* postpetition transfer. It seeks a holding that a transfer is voidable if it occurs after the filing of an SEC complaint pursuant to which a receiver is appointed. The SEC can file actions against broker/dealers in which it does not seek the appointment of a receiver and the

termination of the broker/dealer's operations. In this case, it sought those actions. Because a receiver was appointed, the date the complaint was filed is the "filing date" for the proceeding for the purposes of sections 547 and 549 of the Code.

Spencer also argues that numerous statutory distinctions between the legal effect of the filing of an SEC complaint and the filing of a bankruptcy proceeding weigh against choosing April 8, 1985 as the filing date. However, I have already determined that both the letter and policies of SIPA require fixing the filing date on April 8, 1985. This conclusion is not affected by the fact that some of the later dates suggested by defendants are significant in other contexts of this proceeding.

■ Spencer puts forth two arguments that are most accurately characterized as general defenses to the avoidance action. First, Spencer attempts to use section 546(e) of the Code as a defense to the trustee's action. This provision, which prohibits certain "settlement payments" made *before* commencement of the case, clearly does not apply here. Leaving aside the question whether the transfer of securities to Spencer was a "settlement payment" (the trustee contends it was not), section 546(e) does not apply here because the transfer occurred after April 8, 1985, which I have already held to be the date of commencement of the case.

■ Spencer then argues that the trustee cannot avoid the transfer of securities because the transfer was not illegal at the time it was made. In support of this contention, Spencer correctly points out that in a typical case, a transfer of the debtor's assets after the commencement of the case is illegal, but under section 303(f) of the Code, the transfer of the Spencer certificates was legal because it preceded the entry of an order for relief.

Despite the accuracy of the latter two statements, the argument as a whole is baseless. In a SIPA proceeding, a trustee need not demonstrate any illegal behavior on the part of a customer as a condition precedent to invoking the provisions of section 549. The period of time between the filing of the SEC complaint and the application of SIPC for a protective decree is a "gap" period in which transfers of customer property are not illegal but are avoidable.

Thus, the relevant date for determining whether transfers of certificates from BBS occurred prepetition or postpetition is April 8, 1985, the SIPA filing date. In the case of Spencer, the transfer was postpetition, because it occurred on April 10, 1985.

### D. *Date of Valuation of the Customer Property*

■ The trustee contends that for purposes of section 78fff–2(c)(3), which allows recovery of postpetition transfers only where "customer property is not sufficient to pay in full" all customer-related claims, the fund of customer property should be valued on the SIPA filing date. Spencer opposes this suggestion, contending that such a valuation date would lead to an inaccurate assessment of the insufficiency of the customer fund.

As Spencer points out, it is theoretically possible for the customer fund to be insufficient on the SIPA "filing date" and, because of income on the fund subsequent to the filing date, sufficient to pay all customer-related claims when such payments actually occur. However, the impact in this case of valuing the customer fund on the earlier date is not likely to have a great impact on the Euro defendants. First, the trustee has represented—and defendants have pointed to little contradictory evidence —that customer property will be insufficient to fully satisfy claimants listed in 15 U.S.C. section 78fff–2(c)(1) no matter what date is chosen for valuation of customer property. Second, if by some possibility the passage of time were to yield a 100% payout to customers and SIPC, the defendants in the avoidance actions would receive the benefit of that 100% payout. The trustee has stated that an unsuccessful defendant in an avoidance action will be entitled to assert a claim against the fund of customer property after satisfying the avoidance action judgment.

SIPA and the legislative history are silent on the issue of the timing of the sufficiency valuation. This is not surprising. As stated by the Third Circuit, Congress' intent in SIPA to protect customers is clear, "but the specifics of precise resolution of individual situations are clouded by the provisions of a statute which range far from the clarity of blue sky one might expect in this area of law." *Securities and Exchange Commission v. Aberdeen Securities Co., Inc.*, 480 F.2d at 1123.

Thus, as with determination of the "filing date," I must choose the proper date with reference to the overall purposes of SIPA. A purpose of SIPA is to freeze the broker-dealer's affairs as of the "filing date" in order to accomplish an orderly liquidation. *In Re Bell & Beckwith*, 47 B.R. 528, 531 (Bankr.N.D.Ohio 1985), *aff'd. in unpublished opinion* (N.D.Ohio), *rev'd. on other grounds*, 821 F.2d 333 (6th Cir. 1987). In fulfillment of this objective, numerous provisions of SIPA require that assets and liabilities be fixed as of the filing date. In calculating the "net equity" claim of a customer, SIPA requires that the trustee conduct a hypothetical liquidation of the securities in the customer's account as of the filing date. *See* 15 U.S.C. section 78*lll* (11). In determining what securities are owed a customer, an examination of the books and records of the debtor as of the "filing date" is required. *Matter of Atkeison*, 446 F.Supp. 844, 847 (M.D.Tenn.1977). When distributing securities to customers in satisfaction of net equity claims, "all securities shall be valued as of the close of business on the filing date." *See* 15 U.S.C. section 78fff–2(b).

By use of a uniform filing date, SIPA is designed to insulate the calculation of net equity claims and distributions made on the basis thereof from market fluctuation. *See* 4 *Collier on Bankruptcy*, par. 741.05(1), pp. 741–46 to 741–48 (15th ed. 1987) (because SIPA does not require trustee to liquidate customer securities promptly, "SIPA liquidation customers are at risk for market loss"; valuation of net equity claims as of filing date shields against that loss with regard to *pro rata* distribution).

At least at the outset, it would appear sensible to value the customer fund as of the same time as the various other calculations that take place on the filing date. Defendants argue, however, that this date is inappropriate, apparently proposing that the trustee be required to show insufficiency either (a) the time of the filing of each avoidance complaint, or (b) when judgment is entered in each avoidance case.

In support of their contentions, defendants argue that SIPA requires that the fund of "customer property" include all "earnings on the customer fund" after the filing date, and that failure to include such income in a valuation under section 78fff–2(c)(3) would understate the ability of the fund to pay customer-related claims.

The trustee responds as follows:

What Spencer means by the term "earnings on the customer fund" is unclear. Generally, to the extent that the Trustee received periodic principal and interest payments with respect to securities claimed by Inc.'s so-called "pure purchasers", the principal portion was paid to the pure purchaser to the extent the pure purchaser was entitled to received to receive the securities, and the interest portion was placed in the "Mini–Fund" established by the Intra–Inc. Settlement Agreement. However, if the term "the earnings on the customer fund" relates to interest earned by the Trustee with respect to his investment of cash in the fund of customer property, this "investment interest" has been, and will continue to be, included in the fund of customer property.

Second Reply Brief of Richard W. Hill, Trustee at 20. Thus, the trustee agrees, at least to an extent, with the defendants' contention that the customer property fund must include income on the fund.

However, the trustee argues that the defendants' proposed valuation requirements would impose huge administrative burdens. He asserts that "[t]he trustee and his accountants and consultants spent literally thousands of hours assembling the information necessary to produce Schedule II C to the Intra–Inc. settlement agree-

ment[,]" and are now expending considerable effort "bringing the value of the fund forward to January 1, 1988." Based on this past and present experience, the trustee contends that a requirement that the trustee value the customer fund every time complaint was filed or a judgment is entered would "lead to a logistical nightmare."

The trustee also contends that placing such a continuing burden on the trustee could result in unwarranted defeat or delay of avoidance actions. Theoretically, the fund of customer property might be sufficient to satisfy claims one day but, because of a falling securities market, be insufficient on the next. To dismiss or prevent the trustee from proceeding on his avoidance action because of sufficiency of the customer fund could, if the fund subsequently loses value, prove unfairly prejudicial to customers asserting claims against the fund. Moreover, it would be administratively burdensome to require the trustee to time the litigation so as to be certain that there will be an insufficiency on the date of entry of judgment.

In response to the trustee's concerns regarding the cost and effort of repeated valuations of the customer funds, Spencer offers the glib remark that it "would hope that for the approximately $6 million which the trustee has paid his accountants he has at least been informed of the value of the customer fund and the income earned on that fund on a monthly basis." Defendants also argue that allowing the trustee to bring an avoidance action based only on an insufficiency on the filing date would invite manipulation by the trustee to create apparent insufficiencies when none really exist, and to pay his own fees from the customer fund. *See In re Tenna Corp.*, 801 F.2d 819 (6th Cir.1986).

I am not convinced of the danger of such manipulation or of the prejudice defendants fear will result from any manipulation. The trustee has acknowledged that income earned from the investment of cash in the customer fund belongs in the fund, and has stated that all such income to date has been added to the fund. As noted above, the trustee has also stated that even if an unexpected growth of the customer fund were to result in a 100% payout to customers and SIPC, the defendants in the avoidance actions would receive the benefit of that 100% payout.

The defendants contend that Spencer would be damaged by the cost of the litigation to Spencer and the BBS estate even if they received the full benefit of a 100% payout. In essence, defendants urge the court to impose enormous administrative expenses on the estate in order to avoid the speculative possibility that Spencer will, because of an unexpected sufficiency of the customer fund, turn out to have defended an avoidance action although avoidance of its transfer was not actually necessary to bring the customer fund to 100% sufficiency. This I will not do. The purpose of SIPA, and the responsibility of the court, is to administer the estate in a manner that benefits all customers, not just defendants in avoidance actions. Thus, I find that the date to be used for valuation of the fund of customer property is the SIPA filing date, April 8, 1985, and I will grant the trustee's motion for partial summary judgment on this issue.

### E. The English Law Defense

In a SIPA liquidation proceeding, the trustee becomes the "owner," for the benefit of customers of the debtor, of all securities in the actual or constructive possession of the debtor broker-dealer as of the filing date, other than customer name securities as defined in 15 U.S.C. sec. 78*lll* (3). The securities are part of the fund of customer property available for *pro rata* distribution to customers. To promote equality of distribution to similarly situated claimants, the trustee is permitted, under 15 U.S.C. sec. 78fff–2(c)(3), to recover securities that would have been part of the fund of customer property but for a prior transfer to a customer. The inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities have been part of the fund of customer property? *See* 4 *Collier on Bankruptcy*, par. 749.02[2], p. 749–5 (15th ed. 1987).

The certificates transferred to Spencer on April 10, 1985 would have been "customer property" had they not been transferred. Under SIPA, "customer property" is defined to mean "cash and securities ... at any time received, acquired, or held by or for the account of a debtor from or for the securities account of a customer...." 15 U.S.C. sec. 78lll (4). The certificates the trustee seeks to recover were in a BBS account on April 8, 1985, the statutorily defined "filing date" of the SIPA liquidation proceeding. It is undisputed that the certificates were not registered in Spencer's name. The trustee asserts, and Spencer does not dispute, that Spencer could exercise no control over the certificates since Chase would only accept instructions relating to the certificates by way of a coded telex, and Spencer did not have access to the code. Therefore, because the securities in question were securities "held ... for the account of a debtor [BBS] ... for the securities account of a customer [Spencer,]" they would have been part of the fund of customer property available for *pro rata* distribution had they not been transferred out of the BBS account.

■ Congress empowered the SIPA trustee to recover such property if the transfer by which it was removed from the fund of customer property is void or voidable under the Bankruptcy Code. 15 U.S.C. sec. 78fff–2(c)(3); *see* 1 *Collier on Bankruptcy*, par. 5.08, p. 5–66 (15th ed. 1987). For purposes of determining whether a transfer is void or voidable under the Bankruptcy Code, SIPA treats the securities as if they were owned by the debtor prior to the transfer, and, if the transfer was for the benefit of a customer, treats the customer as if it were a creditor. 15 U.S.C. sec. 78fff–2(c)(3). This treatment of broker-dealers as debtors and customers as creditors is an intended fiction. "The customer is, of course, not an actual creditor and under all state and federal securities laws, the property does not belong to the debtor prior to transfer. The purpose of these fictions is to enable the trustee to fit the transfer into the provisions of the avoidance sections of the Code." 4 *Collier*

*on Bankruptcy*, par. 749.02[2], p. 749–3 (15th ed. 1987) (explaining the purpose of section 749(a) of the Bankruptcy Code, which controls stockbroker liquidations not governed by SIPA); *id.* at par. 749.02[2], p. 749–8 (SIPA avoidance statute analogous to section 749 of the Bankruptcy Code).

This fiction allows the SIPA trustee to avoid postpetition transfers in spite of the fact that a broker-dealer liquidation technically does not involve the debtor-creditor relationship referred to in section 549 of the Bankruptcy Code. For example, section 549(a) allows a bankruptcy trustee to "avoid a transfer of property of the estate...." Utilizing the fiction in 15 U.S.C. sec. 78fff–2(c)(3), "property of the estate" is deemed to mean "customer property" in determining whether a transfer is voidable by a SIPA trustee. The fiction prevents a customer from using a technical reading of section 549 to retain securities that would otherwise be recoverable by the SIPA trustee.

Spencer argues, however, that the transfer of securities cannot be avoided because English law provides that title to the securities vested in the Euro defendants before the certificates were transferred out of safekeeping at Chase. Spencer states:

> By their terms, Sections 547 and 549 of the Code do not allow the trustee to avoid a transfer unless the property in question was the property of the debtor at the time of the challenged transfer. Thus, the trustee has the burden of showing that the transferred property was debtor property....

This statement simply bypasses the provision in 15 U.S.C. sec. 78fff–2(c)(3) that in avoiding a transfer under sections 547 or 549 of the Bankruptcy Code, "customer property" that is transferred to a customer is deemed to have been property of the debtor. Because the certificates that were transferred to Spencer would clearly have been "customer property" but for the transfer, the trustee has shown that the certificates fall within the class of property subject to the avoidance provisions of SIPA and the Bankruptcy Code.

Spencer argues, however, that English law, not the "fiction" contained in SIPA section 78fff–2(c)(3), applies in determining whether the certificates were "property of the debtor" under section 549. I have already discussed the relevant language of SIPA section 78fff–2(c)(3). However, to address Spencer's argument, I now set it forth in its entirety:

Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property. For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

Spencer seizes on the last phrase in the subsection, "the laws of any State to the contrary notwithstanding[,]" and interprets it as defining the entire scope of the provision's preemptive effect on state and foreign law. Because the phrase does not mention foreign law, Spencer argues, foreign law is not preempted; *expressio unius est exclusio alterius.* Because foreign law is not preempted, the "fictions" in the provision—that customer property is deemed to be property of the debtor and that customers are deemed to be creditors—override only state, and not foreign law.

Spencer's argument focusses too narrowly on the last phrase of section 78fff–2(c)(3). The central purpose of the subsection is to permit the trustee to "recover any property transferred by the debtor which, except for such transfer, *would have been customer property* " as defined by SIPA (emphasis supplied). The definition of "customer property" does not contain any requirement that the securities be physically located within the United States. I find it impossible to believe that Congress would have given the trustee such broad avoiding powers in one part of the provision, and then severely limited those avoiding powers in a clause that seems intended to have *preemptive* intent. No legislative history suggests that Congress considered all possibilities for preemption and, in naming one of those possibilities, intended to exclude all others. The statute is known for its lack of clarity. *See Securities and Exchange Commission v. Aberdeen Securities Co., Inc.,* 480 F.2d at 1123.

Moreover, Spencer's interpretation does not stand up in light of an analogous provision in section 749(a) of the Bankruptcy Code, which governs stockbroker liquidations. The last sentence of that provision is virtually identical to the last sentence of SIPA section 78fff–2(c)(3), except that it omits the phrase "the laws of any State to the contrary notwithstanding." There is no reason to believe that Congress intended this provision to apply more expansively in the foreign law context than its near-twin in SIPA.

Viewing SIPA as a whole, Spencer's interpretation runs counter to the statute's purpose to protect customers and to distribute all customer property on a *pro rata* basis. Consistent with Congress' power to prescribe laws governing the conduct of its nationals, whether that conduct takes place in United States or abroad, *see Mannington Mills Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1292 (3d Cir.1979), SIPA grants federal district courts "exclusive jurisdiction of [the] debtor and its property wherever located (including property located outside the territorial limits of such court).... " 15 U.S.C. sec. 78eee(b)(2). The conclusion that Congress intended section 78fff–2(c)(3) to apply to customer property located outside the United States is bolstered by the fact that in this and many other SIPA liquidations, many of the relevant actions took place inside the United States. *See Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1107 n. 11 (7th Cir.1984). The April 10, 1985 transfer of the securities occurred as a result of conduct in both the United States and Eng-

land, and the transfer of the certificates out of the BBS safekeeping account at Chase–London would obviously have a substantial impact upon the fund of customer property available for distribution to the customers of BBS.

Extraterritorial application of SIPA is also consistent with the extraterritorial application of other federal securities laws. In *Securities and Exchange Commission v. Kasser*, 548 F.2d 109, 114 (3d Cir.), *cert. denied sub nom. Churchill Forest Industries (Manitoba) Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), the Third Circuit held that the federal securities laws grant jurisdiction in transnational cases where some or most of the prohibited acts occurred outside the United States. In applying United States securities laws on an extraterritorial basis, the courts have noted the "underlying theory ... that Congress would have wished domestic markets and domestic investors to be protected from improper foreign transactions." *Tamari v. Bache & Co.*, 730 F.2d at 1108; *see also SEC v. Kasser*, 548 F.2d at 116.

Application of SIPA to the transfers also does not implicate comity issues. *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289, 73 S.Ct. 252, 257, 97 L.Ed. 319 (1952). Thus, Spencer's English Law defense is without merit, and must be stricken.

### F. *Taking Clause*

#### 1. Applicable law

■ The power of Congress to enact bankruptcy legislation is subject to the Fifth Amendment's prohibition against taking private property for public use without just compensation. *United States v. Security Industrial Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935). As the Supreme Court noted in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978):

> [There is no] "set formula" for determining when "justice and fairness" require that economic injuries caused by public

action be compensated by the government rather than remain disproportionately concentrated on a few persons. Indeed we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely "upon the particular circumstances [in that] case.

(Citations omitted.) The Court in *Penn Central* identified three factors which have particular significance "in these essentially ad hoc, factual inquiries":

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Id.* (citations omitted).

#### 2. Analysis

Regarding the first factor to be considered in the analysis outlined in *Penn Central*, Spencer contends that the economic impact of the avoidance action is easily quantified, since the trustee has stated that customers will probably be paid approximately 85% of their claims. However, because, as described below, Spencer's argument clearly fails under the second and third prongs of the *Penn Central* framework, I find that avoidance of the transfer does not amount to a taking in spite of the alleged 15% loss.

The impact of government action on the legitimate economic expectations of claimants has been the paramount consideration of the Supreme Court in analyzing bankruptcy legislation under the taking clause. It is particularly noteworthy that the only bankruptcy legislation that failed to pass muster under a taking analysis was a provision in the Frazier–Lemke Act providing

retrospective relief to bankrupt farmers. In *Radford,* 295 U.S. at 589, 55 S.Ct. at 863, the Court stated:

> Because [*Frazier–Lemke Act*] *is retroactive,* in terms, and as here appled, purposts to take away rights of the mortgagee in specific property, [the Fifth Amendment] is controlling ... [T]he effect of the act here complained of ... is *the taking of substantive rights in specific property acquired by the bank prior to the act.*

*See also Security Industrial Bank,* 459 U.S. at 81, 103 S.Ct. at 414 ("No bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress"); *Matter of Bevill, Bresler & Schluman, Inc.,* 59 B.R. at 375.

Unlike both *Radford* and *Security Industrial Bank,* the present case involves only the prospective application of a bankruptcy law. Since the customer property/customer name security distinction was made a part of SIPA in 1978, investors have been on notice as to what they must do to maintain an exclusive property right in a security in the event of a broker bankruptcy. Courts have frequently relied upon the fact of notice in upholding the constitutionality of bankruptcy laws. *See, e.g., In re Groves,* 707 F.2d 451, 452–53 (10th Cir.1983); *Tepper v. Chichester,* 285 F.2d 309, 313 (9th Cir.1960). From the effective date of the 1978 amendments onward, investors, including Spencer, who have faced the choice of whether or not to incur the additional expense of opening their own safekeeping accounts or, if possible, having their securities registered in their own name, have made the the choice with at least constructive knowledge of the consequences. *Matter of Bevill, Bresler & Schulman, Inc.,* 59 B.R. at 376.

In attempting to fit this case within the analytical framework of traditional "taking" analysis, Spencer argues that its investment-backed expectations included its belief that (1) its rights in the certificates were controlled by English law, and (2) the certificates were being held in a safekeeping facility at Chase in Spencer's name. However, these assertions mistake the type of "investment-backed expectations" that are protected by the taking clause. Parties must bear the burden of their own erroneous interpretations of United States law. It would be a perversion of the taking clause to hold that it protects parties against their own mistakes, and prohibits avoidance under the bankruptcy laws whenever a recipient of a transfer incorrectly believed that the transfer was not voidable. Similarly, the taking clause does not protect Spencer from the consequences of its allegedly being misled as to the nature of the safekeeping account at Chase. The determinative fact is that the relevant provision of SIPA had already been enacted when Spencer acquired the certificates and when the certificates were deposited at Chase. When these events occurred, Spencer had at least constructive knowledge of the 1978 SIPA amendments, and knowingly took the risk that its certificates were not as safe as it thought they were.

As to the final consideration in a taking analysis enumerated in *Penn Central,* the character of the government action, the Supreme Court has carefully distinguished between action which results in a permanent physical occupation of real property and an "interference which arises from some public program adjusting the benefits and burdens of economic life to promote the public good." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). A permanent physical occupation or invasion of property invariably involves an unconstitutional taking, *Loretto,* 458 U.S. at 426–27, 102 S.Ct. at 3171, whereas, by definition, the adjustment of economic burdens is one of the principal functions of bankruptcy legislation.

Congress must have the freedom to adjust benefits and burdens when it acts pursuant to its bankruptcy powers, because—again, by definition—there are always too few funds of the bankrupt to make all of the creditors whole. The Fifth Amendment taking clause does not

require Congress to be the guarantor of defaulting debtors.

*Matter of Gifford,* 688 F.2d 447, 460 (7th Cir.1982).

Spencer concedes that the SIPA distribution scheme generally represents a public program intended to promote the common good. Indeed, the underlying purpose of SIPA was to restore and maintain the confidence of investors in the capital markets and thereby protect the markets. This purpose is advanced by the equitable distribution of property and provisions for additional protection by way of SIPC advances. Adoption of the new categories of customer property and customer name securities in the 1978 amendments to SIPA were intended to cure certain inequities under the 1970 Act in the treatment of customers of the bankrupt broker. *See Matter of Bevill, Bresler & Schulman, Inc.,* 59 B.R. at 359–360. Spencer's claim that the statute does not promote the common good as applied in the present action is meritless. It is no less a public program of the kind envisioned in *Loretto* merely because, in the process of benefitting the majority of BBS' customers, it will have an adverse impact on Spencer. SIPA, as amended and as applied to the facts of this case, does not work a "taking" of Spencer's property in violation of the Fifth Amendment. Thus, Spencer's motion for summary judgment on this issue will be denied, and the defense will be stricken.

## CONCLUSION

1. The trustee's motion for partial summary judgment on the filing date issue is granted. For purposes of this avoidance action under 15 U.S.C. sec. 78fff–2(c)(3) and 11 U.S.C. sec. 549, the "filing date" and the date of "commencement of the case" are April 8, 1985.

2. The trustee's motion for partial summary judgment on the date of valuation of the fund of customer property is granted, and the fund of customer property shall be valued for the purposes of 15 U.S.C. sec. 78fff–2(c)(3) as of April 8, 1985.

3. The trustee's motion to strike Spencer's English law defense is granted.

4. Spencer's motion for summary judgment dismissing the complaint based on its defense that recovery of the certificates would violate the Fifth Amendment taking clause is denied, and the defense will be stricken.

I shall enter an appropriate order.